903 F.2d 146
 58 USLW 2680
 William B. YOUNG, Jr., and Joseph Walley, on behalf of
themselves and all other persons who are similarly
situated; and Legal Action Center for
the Homeless, Plaintiffs-Appellees,
Sheron Gilmore, Plaintiff-Intervenor-Appellee,
v.
NEW YORK CITY TRANSIT AUTHORITY, Metropolitan Transportation
Authority of the State of New York, Metro-North Commuter
Railroad Company, The Long Island Rail Road Company, The
Port Authority of New York and New Jersey, and Robert R.
Kiley, as Chairman of the New York City Transit Authority,
the Metropolitan Transportation Authority of the State of
New York, the Metro-North Commuter Railroad Company, and the
Long Island Rail Road Company, and Robert Abrams, as
Attorney General of the State of New York, Defendants-Appellants,
Philip D. Kaltenbacher, Chairman, Robert F. Wagner, Sr.,
Vice-Chairman, Hazel Frank Gluck, James G. Hellmuth, Henry
F. Henderson, Jr., William K. Hutchison, Richard C. Leone,
Basil Patterson, John G. McGoldrick, William J. Ronan,
Howard Schulman, and Robert Van Buren, as the Board of
Commissioners of the Port Authority of New York and New
Jersey, Appellants.
 Nos. 1170, 1171 and 1202, Dockets 90-7115, 90-7137 and 90-7183.
 United States Court of Appeals,
Second Circuit.
 Argued March 5, 1990.
Decided May 10, 1990.
 
 George Sommers (John E. Kirklin, Geoffrey Potter, Douglas Lasdon, Patrick Horvath, the Legal Action Center for the Homeless, New York City, of counsel), for plaintiffs-appellees.
 Adam S. Cohen (Jane E. Booth, Kalman Finkel, Helaine M. Barnett, The Legal Aid Soc., New York City, of counsel), for plaintiff-intervenor-appellee.
 Susan E. Weiner (Floyd Abrams, Cahill, Gordon & Reindel, New York City, of counsel), for defendants-appellants New York City Transit Authority, Metropolitan Transportation Authority, Metro-North Commuter R.R., Long Island Rail Road, and Robert R. Kiley.
 Joseph Lesser (Arthur P. Berg, Arnold D. Kolikoff, Carlene V. McIntyre, James M. Begley, New York City, of counsel), for defendants-appellants Port Authority of New York and New Jersey and the Com'rs thereof.
 O. Peter Sherwood, Sol. Gen. (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Daniel Smirlock, Asst. Atty. Gen., New York City, of counsel), for defendant-appellant Robert Abrams.
 Norman Siegel (Robert Levy, Steven Glauberman, the New York Civil Liberties Union Foundation, New York City, of counsel), for amicus curiae New York Civil Liberties Union Foundation.
 Before TIMBERS, MESKILL and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 The central issue on this appeal is whether the prohibition of begging and panhandling[1] in the New York City subway system violates the First Amendment of the United States Constitution. Defendants-appellants New York City Transit Authority ("TA") and Metropolitan Transportation Authority of the State of New York ("MTA") appeal from a judgment entered in the United States District Court for the Southern District of New York, (Leonard B. Sand, Judge ), permanently enjoining the TA from the enforcement of N.Y.Comp.Codes R. & Regs. tit. 21, Sec. 1050.6 (1989) ("21 N.Y.C.R.R. Sec. 1050.6" and "Sec. 1050.6"), a regulation prohibiting begging and panhandling in the subway system. They are joined by defendants-appellants Metro-North Commuter Railroad Company ("Metro-North"), Long Island Rail Road Company ("LIRR") and Port Authority of New York and New Jersey ("Port Authority") to the extent that the district court's judgment enjoins the enforcement of the prohibition against begging in their respective transit facilities. In addition, defendants-appellants New York State Attorney General Robert Abrams ("Attorney General") and Port Authority appeal from that portion of the district court's judgment holding New York Penal Law Sec. 240.35(1) (McKinney 1989) ("N.Y. Penal Law Sec. 240.35(1)" and "Sec. 240.35(1)") to be unconstitutional under the New York State Constitution.
 
 
 2
 Upon request of the TA and the Port Authority, this Court issued a complete stay pending appeal of the district court's judgment and expedited the appeal on February 7, 1990. On this appeal, as in the district court, the TA argues that begging is not expression protected by the First Amendment, that the subway is not a designated public forum for begging, and that the TA's regulation prohibiting begging is a reasonable time, place, or manner restriction. The Port Authority and the Attorney General argue, inter alia, that the plaintiffs failed to allege an actual case or controversy in connection with the New York Penal Law, and they join in the contention that begging is not protected expression under the First Amendment.
 
 
 3
 The district court concluded that begging constitutes a type of speech that merits the full protection of the First Amendment. Absent an analysis as per United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and an appropriate reading of Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), hereinafter discussed at some length, we might be inclined to agree.
 
 
 4
 We do not think, however, that the regulation is directed at speech itself and must be justified by the substantial showing of need that the First Amendment requires. Indeed, the regulation expressly authorizes public speaking and the distribution of written materials. We conclude, therefore, that the regulation is justified by governmental interests that are content neutral and unrelated to the suppression of free expression. Consequently, the regulation comes under the more relaxed level of scrutiny contemplated in O'Brien and developed in several recent Supreme Court cases. Pursuant to the O'Brien standard, we have no doubt that the regulation comports with the First Amendment.
 
 
 5
 For the reasons set forth below, we reverse and vacate that part of the district court's judgment enjoining the enforcement of 21 N.Y.C.R.R. Sec. 1050.6 as in contravention of the First Amendment, and we vacate that part of the judgment declaring N.Y. Penal Law Sec. 240.35(1) to be violative of the New York State Constitution.
 
 BACKGROUND
 A. The Original Controversy
 
 6
 On November 28, 1989, the Legal Action Center for the Homeless ("LACH") filed suit in the district court on behalf of itself and two homeless men, William B. Young and Joseph Walley, as representative plaintiffs for a class of homeless and needy persons who beg and panhandle in the New York City subway system. The gravamen of the complaint was that the prohibition of begging and panhandling in the subway contravenes the rights to free speech, due process and equal protection of the law. Specifically, the complaint alleged that the enforcement of 21 N.Y.C.R.R. Sec. 1050.6 violated the First and Fourteenth Amendments of the United States Constitution, Article I, Secs. 6, 8 and 11 of the New York State Constitution, and 42 U.S.C. Secs. 1981 and 1983. Pending the district court's action in declaring the prohibition unconstitutional, the plaintiffs also sought certain preliminary and injunctive relief. Accordingly, they entreated the district court to restrain the defendants from enforcing the prohibition, and to require the defendants to disseminate information throughout the subway system that begging and panhandling are lawful activities.
 
 
 7
 LACH named the TA, MTA and Metro-North as defendants. Under the direction of the MTA, the TA is empowered to establish regulations governing passenger conduct, in order to facilitate an effective, safe and reliable means of public transportation. N.Y.Pub.Auth.Law Sec. 1201 et seq. (McKinney 1982 & Supp.1990). Towards this end, the TA has maintained a longstanding ban on begging and panhandling in the subway system. 21 N.Y.C.R.R. Sec. 1050.6.
 
 
 8
 In January 1989, the MTA and TA approved the commencement of a rule-making process to amend 21 N.Y.C.R.R. Sec. 1050.6. The existing regulation stipulated that "no person, unless duly authorized ... shall upon any facility or conveyance ... solicit alms, subscription or contribution for any purpose." Sec. 1050.6(b). The process, which included four public hearings, did not alter Sec. 1050.6(b), but only added a provision, Sec. 1050.6(c). The amendment permits greater utilization of the transit system for certain non-commercial activities such as: "public speaking; distribution of written materials; solicitation for charitable, religious or political causes; and artistic performances, including the acceptance of donations." Sec. 1050.6(c). Pursuant to the amended regulation, these non-transit uses are subject to certain place restrictions. In particular, solicitation for charitable, religious or political causes is prohibited on subway cars, in areas not generally open to the public, within twenty-five feet of a token booth or fifty feet from the entrance to an authority office or tower, Sec. 1050.6(c)(1), in any "location which interferes with access onto or off an escalator, stairway or elevator," Sec. 1050.6(c)(2), and "on a subway platform while construction, renovation or maintenance work is actively underway on or near the platform ...," Sec. 1050.6(c)(3). The amended regulation, which continues the TA's long-standing ban against begging and panhandling, became effective in October 1989.
 
 
 9
 At that time, the TA commenced "Operation Enforcement", a program designed to implement more effectively the long-standing prohibition on begging and panhandling in the subway. At the outset of Operation Enforcement, the TA distributed 1,500,000 pamphlets that summarized eleven TA rules, including "No panhandling or begging." The TA rules were also displayed on 15,000 posters throughout the subway system. Both the pamphlets and the posters warned that violation of the TA rules could lead to arrest, fine and/or ejection. Plaintiffs Young and Walley acknowledge in affidavits submitted to the district court that they saw the posters and pamphlets during the information campaign of Operation Enforcement. Although they state their understanding that the TA intends to enforce the rules, they admit that they have continued to beg and panhandle. They further acknowledge that when the police have observed the behavior, rather than arrest them or issue a summons, the police have requested that they stop the proscribed activity or leave the system.
 
 
 10
 Before the district court was the following additional evidence. The New York City Subway System transports approximately 3,500,000 passengers on an average workday, operates twenty-four hours a day, seven days a week, and consists of 648 miles of track, 468 subway stations and over 6,000 subway cars. Many parts of the subway system are almost one hundred years old. In a timeworn routine of New York City life, each day a multitude descends the steep and long staircases and mechanical escalators to wait on narrow and crowded platforms bounded by dark tunnels and high power electrical rails.
 
 
 11
 In 1988, the TA initiated a lengthy study-process concerning "quality of life problems" experienced by riders in their use of the subway system. The study-process disclosed the fact that begging contributes to a public perception that the subway is fraught with hazard and danger. A research survey conducted by Peter Harris revealed that, in fact, two-thirds of the subway ridership have been intimidated into giving money to beggars. The survey also revealed that beggars are perceived to pervade the subway system, and that the ridership considers the presence of beggars as a significant problem.
 
 
 12
 As another aspect of the study-process, Detective Bernard Jacobs, a twenty-four year veteran of the Transit Authority Police and initiator of the Transit Police Crime Prevention Unit, met with numerous groups of citizens and passengers. He reported that "passengers almost always voice their concern and discomfort about the prevalence of panhandling" in the subway system. The passengers "feel harassed and intimidated by panhandlers." Moreover, "it is difficult from the police perspective to draw the fine line between panhandling and extortion." Many passengers have complained that demands for money by beggars and panhandlers include "unwanted touching, detaining, impeding and intimidating."
 
 
 13
 An outside consulting company retained during the study-process confirmed the reality that begging and panhandling in the subway system pose a multi-faceted problem. Professor George Kelling, the president of the consulting company and an expert with extensive national and international experience in social problems, concluded that behavior such as begging generates "high levels of fear in the passengers, thereby discouraging use of the system." In explaining the need for rules against begging in the subway, Kelling drew a distinction between ordinary city streets and the more constrictive New York City subway system. Open city streets allow pedestrians what sociologists term "fate-control", or the ability to avoid and move away from an intimidating person. To the contrary, subway riders enjoy considerably less fluidity of movement and ability to control what happens to them. Whether standing in the crush of riders in a speeding subway car, waiting among the pressing masses on a platform, or swarming with the throng through a maze of mezzanines, staircases and ramps, the rider feels "captive". As a result, Kelling concluded, "[i]n the subway environment, begging is inherently aggressive even if not patently so." In addition, Kelling concluded that begging not only intimidates passengers, but also "has the serious potential of creating an accident and injuring many people." As Kelling observed, the act of placing a cup before persons is often disruptive, startling and potentially dangerous.
 
 
 14
 During the course of the study-process, TA concerns were not limited to the safety of the ridership and their continued patronage. The Kelling affidavit earmarks research indicating that the homeless in the subways are generally males afflicted with serious mental illness and suffering from alcohol and/or drug abuse. Moreover, the sad statistics reveal that during a ten month period in 1989, an average of six homeless persons per month died in the subway, including fifteen persons who were struck by trains. As a result, Kelling counselled that this "subset of the homeless" should not be encouraged to beg and panhandle in the system "for their own well-being".
 
 B. Proceedings in the District Court
 
 15
 At oral argument on December 1, 1989, LACH elucidated its position. LACH suggested that "whenever a homeless and needy person is extending his hand, he is communicating" and, therefore, the action enjoys full First Amendment protection. Acknowledging as constitutionally valid the place restrictions in the August 1989 amended regulation, LACH challenged as unconstitutional the regulation's distinction between solicitation for charitable, religious or political causes and solicitation of alms by private individuals. On this basis, LACH argued that the total ban on begging and panhandling in the subway system was constitutionally impermissible.
 
 
 16
 The district court directed attention to several potential ambiguities in the regulation's language. In particular, the district court doubted whether the regulation's "distinction between 'solicit alms' and 'solicit for charitable purposes' " could "survive a ... challenge for vagueness." The court further called into question the meaning of the phrase "unless duly authorized by the Authority," and asked whether the TA had "adopted any rules, regulations or standards for the grant or denial of authority." Instructing the TA to brief this issue for the next oral argument, the district court queried "whether this is the regulation that ... [the TA] want[s] to take to the Supreme Court."
 
 
 17
 In the interim, the TA promptly responded to the district court's concerns about potential ambiguities in the August 1989 amended regulation. A revised regulation was adopted on December 15, 1989. The revision expressly states: "No person shall panhandle or beg upon any facility or conveyance." 21 N.Y.C.R.R. Sec. 1050.6(b)(2). Additionally, the revised regulation prohibits all solicitation for charity except by organizations that:
 
 
 18
 (1) have been licensed for any public solicitation within the preceding twelve months by the Commissioner of Social Services of the City of New York under Sec. 21-111 of the Administrative Code of the City of New York or any successor provision, or (2) are duly registered as charitable organizations with the Secretary of State of the State of New York under Sec. 172 of the New York Executive Law or any successor provision, or (3) are exempt from federal income tax under Sec. 501(c)(3) of the United States Internal Revenue Code or any successor provision.
 
 
 19
 21 N.Y.C.R.R. 1050.6(c). With the exception of these clarifications, the 1989 amended regulation remained unchanged.
 
 
 20
 At a second oral argument on December 18, 1989, the district court granted plaintiffs' motion for an order temporarily restraining the TA from enforcing the prohibition on begging and panhandling. During the argument, the district court informed the parties that it had, sua sponte, written to the New York Attorney General providing him with the opportunity to intervene in the suit. The district court's December 15, 1989 letter alerted the Attorney General of the court's belief that this case "call[s] into question the constitutionality of New York Penal Law Section 240.35." The statute in pertinent part provides that: "[A] person is guilty of loitering when he ... [l]oiters, remains or wanders about in a public place for the purpose of begging." N.Y. Penal Law Sec. 240.35(1). By a telephone call on the morning of December 18, 1989, the Attorney General's office declined the court's invitation to intervene. The district court then instructed the plaintiffs to file an amended complaint challenging N.Y. Penal Law Sec. 240.35(1) and naming the Attorney General as a defendant in the case.
 
 
 21
 At this time, the district court also entertained a motion made by the Legal Aid Society to intervene on behalf of Sheron Gilmore. Both the TA and LACH opposed the motion, maintaining that Gilmore was a member of the class represented by Walley and Young and her intervention was not necessary to develop the factual issues in this case. The court, nevertheless, opined that "the case is a very difficult and important case and that there is sufficient work to be done so that the court would welcome the additional resource which the Legal Aid Society can provide." Consequently, the motion was granted. On December 27, 1989, the plaintiffs filed an amended complaint. Complying with the district court's instructions, they named the Attorney General as a defendant and challenged N.Y. Penal Law Sec. 240.35(1). They also added as defendants the LIRR and the Port Authority.
 
 
 22
 A third oral argument was conducted on January 22, 1990. Once again, the district court instructed the plaintiffs to amend the complaint. This time the list of defendants was augmented to include all twelve commissioners of the Port Authority rather than solely the Chairman. In addition, the court suggested the plaintiffs redefine the representative class by deleting "homeless" from the description and encompassing "all needy people" who live in New York State. As per the court's directions, the plaintiffs moved to amend the complaint.
 
 
 23
 Thus, not satisfied with the scope of the original controversy, the district court directed that the complaint be amended on numerous occasions; it sua sponte contacted the Attorney General, and when he declined to intervene, directed that he be made a party so that N.Y.Penal Law Sec. 240.35(1) be at issue; it instructed that over a dozen defendants be added, and that the class be enlarged to include all needy persons in New York State.
 
 
 24
 On January 25, 1990, the district court issued its Opinion and Order. 729 F.Supp. 341. As preliminary matters, the court granted plaintiffs' motions to include the twelve Port Authority commissioners and to certify a class of "all needy persons who live in the State of New York, who are or will be asking or soliciting others for charity for their own benefit in the train, bus or subway stations of New York City or all other places within the jurisdiction of defendants where this is presently prohibited."
 
 
 25
 Pursuant to the standards for a preliminary injunction, the district court then considered "whether there exist sufficiently serious questions going to the merits of the dispute as to make them fair ground for litigation or whether plaintiffs have shown a likelihood of success on the merits." The district court first focused its attention on the challenge to the New York Penal Law. Citing to People v. Bright, 71 N.Y.2d 376, 526 N.Y.S.2d 66, 520 N.E.2d 1355 (1988), the district court held that the state statute violates the due process clause of the New York State Constitution.
 
 
 26
 When the court turned to the plaintiffs' challenge to 21 N.Y.C.R.R. Sec. 1050.6, its findings were not as clear. First, the court found itself unable to distinguish charitable solicitation and begging on the basis of the "diminished communicative content of begging, the differences between the relative intents of the two types of solicitors, and the historical treatment of begging." In light of the Supreme Court's decision in Schaumburg, supra, the court concluded that "begging can be protected by the First Amendment."
 
 
 27
 The court next considered whether the subway system was a traditional or designated public forum. Previously, we held in Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority, 745 F.2d 767, 773 (2d Cir.1984), that the subway is neither a designated nor a traditional public forum. However, the district court proffered that since the holding in Gannett Satellite preceded the 1989 amendment of Sec. 1050.6(c), which allows certain non-transit uses of the system, our decision was of "limited precedential value". Citing to Gannett Satellite, the district court reasoned that "public property which is neither a traditional nor a designated public forum may still serve as a forum for free expression if that expression is 'appropriate for the property'."
 
 
 28
 Finally, the district court suggested that the total ban on begging and panhandling is not narrowly tailored to serve a state interest. Under unchallenged regulations, solicitation is prohibited if conducted in a manner reasonably intended to "annoy[ ], alarm[ ] or inconvenienc[e] others" or which "otherwise tend[s] to create a breach of peace," 21 N.Y.C.R.R. Sec. 1050.6(a); in a manner which "may tend to cause harm or damage to any person," Sec. 1050.7(k); or in a manner that "blocks free movement," Sec. 1050.7(j). These prohibitions, rather than a total ban, constitute reasonable time, place and manner restrictions, according to the district court.
 
 
 29
 Thus, with regards to the merits of plaintiffs' challenge to 21 N.Y.C.R.R. Sec. 1050.6, the district court concluded that "there are serious questions as to its constitutionality both on its face and as applied to plaintiffs." On the basis of this conclusion, the district court granted a preliminary injunction against defendant TA from enforcement of the regulation.
 
 
 30
 For similar reasons, the district court granted a preliminary injunction against Port Authority from enforcing a prohibition against begging and panhandling through regulations that authorize a variety of expressive activities by a permit system on a first-come, first-serve basis. See N.Y.Comp.Codes R. & Regs. tit. 21, Secs. 1220.16, 1221.25 & 1290.3 (1973) ("21 N.Y.C.R.R. Secs. 1220.16, 1220.25 & 1290.3"). In addition, the district court held that since the Port Authority approach relied on N.Y. Penal Law Sec. 240.35(1) as a basis for withholding permits to beg, the permit approach violated due process under the New York State Constitution.
 
 
 31
 In an Order dated February 2, 1990, the district court converted the preliminary injunction against enforcing the prohibition of begging and panhandling to a permanent injunction. Pending the outcome on appeal to this court, the district court directed that begging and panhandling be permitted on subway platforms and mezzanines except when under construction, repair or maintenance, while at the same time temporarily prohibiting such behavior on subway trains and in the restricted areas where organized charitable solicitation is prohibited under 21 N.Y.C.R.R. Sec. 1050.6(c). On February 7, 1990, we granted a motion of the TA and Port Authority for a stay of the district court's injunction until their appeal was decided. On February 15, 1990, the Attorney General filed a notice of appeal to this Court, challenging the district court's conclusion that N.Y. Penal Law Sec. 240.35(1) violates New York law.
 
 DISCUSSION
 A. Speech v. Conduct
 
 32
 On this appeal the plaintiffs contend that "begging is pure speech fully protected by the First Amendment." Recently, the Supreme Court once again admonished against adopting the " 'view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.' " Texas v. Johnson, U.S. ----, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (quoting United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968)). The Court further cautioned that "[t]he Government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." Id., 109 S.Ct. at 2540. Despite the warning, the plaintiffs nevertheless invoke the First Amendment on the ground that "whenever a homeless and needy person is extending his hand, he is communicating."
 
 
 33
 We initiate our discussion by expressing grave doubt as to whether begging and panhandling in the subway are sufficiently imbued with a communicative character to justify constitutional protection. The real issue here is whether begging constitutes the kind of "expressive conduct" protected to some extent by the First Amendment.
 
 
 34
 Common sense tells us that begging is much more "conduct" than it is "speech". As then Circuit Judge Scalia once remarked: "That this should seem a bold assertion is a commentary upon how far judicial and scholarly discussion of this basic constitutional guarantee has strayed from common and common-sense understanding." Community for Creative Non-Violence v. Watt, 703 F.2d 586, 622 (D.C.Cir.1983) (rejecting the notion that sleeping in public parks is expressive conduct about the plight of the homeless) (Scalia, J., dissenting), rev'd sub nom. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Here, what common sense beckons the law ordains.
 
 
 35
 In determining "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Supreme Court asks "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.' " Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (quoted in Texas v. Johnson, 109 S.Ct. at 2539) (emphasis added). For example, the Supreme Court has recognized the "expressive nature" in the burning of a United States flag by a protestor during a political march at the Republican National Convention, Texas v. Johnson, 109 S.Ct. at 2540, in the wearing of black arm-bands by school students on particular days in protest of the Vietnam War, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969), in the peaceful picketing by union members of a supermarket in a large shopping center to protest unfair labor practices, Amalgamated Food Employees Union Local 509 v. Logan Valley Plaza, Inc., 391 U.S. 308, 313-14, 88 S.Ct. 1601, 1605-06, 20 L.Ed.2d 603 (1968), and in conducting a silent sit-in by black persons against a library's segregation policy, Brown v. Louisiana, 383 U.S. 131, 141-42, 86 S.Ct. 719, 723-24, 15 L.Ed.2d 637 (1966). We note that in all of these cases there was little doubt from the circumstances of the conduct that it formed a clear and particularized political or social message very much understood by those who viewed it. More than one constitutional scholar has commented that in these cases the "expressive behavior is '100% action and 100% expression.' " L. Tribe, American Constitutional Law Sec. 12-7, at 827 (2d ed. 1988) (quoting Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv.L.Rev. 1482, 1495-96 (1975)). In other words, the conduct and the expression were inextricably joined.
 
 
 36
 Pursuant to the criteria articulated in Spence, 418 U.S. at 410-11, 94 S.Ct. at 2730, begging is not inseparably intertwined with a "particularized message." It seems fair to say that most individuals who beg are not doing so to convey any social or political message. Rather, they beg to collect money. Arguably, any given beggar may have "[a]n intent to convey a particularized message," e.g.: "Government benefits are inadequate;" "I am homeless;" or "There is a living to be made in panhandling." To be sure, the possibilities are myriad. However, despite the intent of an individual beggar, there hardly seems to be a "great likelihood" that the subway passengers who witness the conduct are able to discern what the particularized message might be.
 
 
 37
 Even where an individual intends to communicate some particularized message through an act of begging, we wonder whether the conduct is not divested of any expressive element as a result of the special surrounding circumstances involved in this case. In the subway, it is the conduct of begging and panhandling, totally independent of any particularized message, that passengers experience as threatening, harassing and intimidating. Unlike burning a flag, wearing a black arm-band, sitting or marching, begging in the subway is experienced as transgressive conduct whether devoid of or inclusive of an intent to convey a particularized message. See O'Brien, 391 U.S. at 382, 88 S.Ct. at 1681 ("The case at bar is therefore unlike one where ... the communication allegedly integral to the conduct is itself thought to be harmful."). Given the passengers' apprehensive state of mind, it seems rather unlikely that they would be disposed to focus attention on any message, let alone a tacit and particularized one.
 
 
 38
 The only message that we are able to espy as common to all acts of begging is that beggars want to exact money from those whom they accost. While we acknowledge that passengers generally understand this generic message, we think it falls far outside the scope of protected speech under the First Amendment. We certainly do not consider it as a "means indispensable to the discovery and spread of political truth." Whitney v. California, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., joined by Holmes, J., concurring). Nor do we deem it as communicating one of the "inexpressible emotions" falling " 'under the protection of free speech as fully as do Keats' poems or Donne's sermons.' " Cohen v. California, 403 U.S. 15, 26, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) (quoting Winters v. New York, 333 U.S. 507, 528, 68 S.Ct. 665, 676, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting)). Consistent with its prior circumscription of what constitutes protected expressive conduct, the Supreme Court recently declared: "It is possible to find some kernel of expression in almost every activity a person undertakes ... but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, --- U.S. ----, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989).
 
 
 39
 The plaintiffs also contend that begging and panhandling on the subway sometimes occasion questions from, and conversations with, passengers. We do not doubt that the proscribed activity may sometimes involve speech and upon occasion even give rise to the exchange of speech. We do not accept, however, that this incidental speech is one and the same as the conduct being regulated. Actual speech which may arise as an incident to conduct is not at issue here. The regulation at stake does not prevent any individual from speaking to passengers. Further, the First Amendment protects speech and not every act that may conceivably occasion engagement in conversation.
 
 
 40
 Whether with or without words, the object of begging and panhandling is the transfer of money. Speech simply is not inherent to the act; it is not of the essence of the conduct. Although our holding today does not ultimately rest on an ontological distinction between speech and conduct, we think this case presents a particularly poignant example of how the distinction subsists in right reason and coincides with common sense. To be sure, these qualities ought not to be forsaken in our legal analysis.
 
 B. The "Schaumburg" Trilogy
 
 41
 On this appeal the plaintiffs also argue that there is no meaningful distinction between begging and other types of charitable solicitation. The contention is an echo of the district court's finding that "a meaningful distinction cannot be drawn for First Amendment purposes between solicitations for charity and begging." The district court based its finding on three Supreme Court cases: Schaumburg, supra; Secretary of State of Maryland v. Joseph H. Munson Co., Inc., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); and Riley v. National Federation of The Blind of North Carolina, Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In these cases the Supreme Court considered laws regulating solicitations by organized charities, and held that such solicitation constituted a type of speech protected by the First Amendment. At a loss to detect a distinction between such solicitation and begging, the district court reasoned that begging must also enjoy constitutional protection. The district court apparently assumed that the outcome of the three Supreme Court cases would have been the same if, instead of involving door-to-door solicitation by organized charities, they had involved begging and panhandling in the subway. We think that the district court misconstrued the line of reasoning that underpins the trilogy.
 
 
 42
 The Supreme Court's holding in Schaumburg rested on the reasoning that appeals by organized charities "involve a variety of speech interests" including "communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes." Schaumburg, 444 U.S. at 632, 100 S.Ct. at 833. The Court continued that such "solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues." Id. Absent solicitation by organized charities, the Court expressed its concern that "the flow of such information and advocacy would likely cease." Id. As a result, the Court concluded that "[c]anvassers in such contexts are necessarily more than solicitors for money" and do "more than inform private economic decisions." Id.
 
 
 43
 Upon revisiting the charitable solicitation field in Munson, the Supreme Court quoted all of the above Schaumburg language as the basis for concluding that "charitable solicitations are so intertwined with speech that they are entitled to the protections of the First Amendment." Munson, 467 U.S. at 959, 104 S.Ct. at 2848. In Riley, the Court reiterated that limitations preventing charitable organizations from raising contributions were "unconstitutional under the force of Schaumburg." Riley, 108 S.Ct. at 2673.
 
 
 44
 The facts in Munson demonstrate the significance of the nexus between solicitation and traditional First Amendment activities. Munson was a professional fundraiser who challenged a Maryland statute that prohibited charitable organizations from paying any more than twenty-five percent of the amount raised by fund-raising activity to such professional fund-raisers. The Supreme Court struck down the statute on the ground that "charities often ... combin[e] solicitation with dissemination of information, discussion, and advocacy of public issues, an activity clearly protected by the First Amendment," and not upon the fundraiser's right to retain the funds he solicited on behalf of the charity. Munson, 467 U.S. at 961, 104 S.Ct. at 2849. See also Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985) ("the nexus between solicitation and the communication of information and advocacy of causes.... implicates interests protected by the First Amendment"); cf. Ohralik v. Ohio State Bar Ass'n., 436 U.S. 447, 457-58, 98 S.Ct. 1912, 1919-20, 56 L.Ed.2d 444 (1978) (lawyer's unsolicited legal advice did not implicate First Amendment since "it actually may disserve the individual and societal interest ... in facilitating 'informed and reliable decisionmaking' ") (citation and footnote omitted). Thus, neither Schaumburg nor its progeny stand for the proposition that begging and panhandling are protected speech under the First Amendment. Rather, these cases hold that there is a sufficient nexus between solicitation by organized charities and a "variety of speech interests" to invoke protection under the First Amendment.
 
 
 45
 Consistent with the Schaumburg reasoning, the TA amended 21 N.Y.C.R.R. Sec. 1050.6 to allow for solicitation by organized charities in certain areas of the subway system, while totally prohibiting begging and panhandling. Despite the district court's inability to draw a distinction between begging and solicitation by organized charities, the amended regulation reflects the TA's ability to do so. Before the district court was evidence that subway passengers experience begging as intimidating, harassing and threatening. Moreover, the passengers perceive that beggars and panhandlers pervade the system. Indeed, such conduct has been reported in virtually every part of the system. Nowhere in the record is there any indication that passengers felt intimidated by organized charities. In amending the regulation based on its experience, the TA drew a distinction between the harmful effects caused by individual begging and the First Amendment interests associated with solicitation by organized charities. Further, the TA obviously made a judgment that while solicitation by organized charities could be contained to certain areas of the system, the problems posed by begging and panhandling could be addressed by nothing less than the enforcement of a total ban. We think that the amendment of the regulation reflects the TA's concerns to respect the First Amendment in accordance with Schaumburg and at the same time to protect its patrons from being accosted. We find no reason to quarrel with these legitimate concerns.
 
 
 46
 Both the reasoning of Schaumburg and the experience of the TA point to the difference between begging and solicitation by organized charities. In the instant case, the difference must be examined not from the imaginary heights of Mount Olympus but from the very real context of the New York City subway. While organized charities serve community interests by enhancing communication and disseminating ideas, the conduct of begging and panhandling in the subway amounts to nothing less than a menace to the common good. See Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984) (The government may "protect its citizens from unwanted exposure to certain methods of expression which may legitimately be deemed a public nuisance."). The lone dissent in Schaumburg recognized this difference stating: "[N]othing in the United States Constitution should prevent residents of a community from making the collective judgment that certain worthy charities may solicit ... while at the same time insulating themselves against panhandlers, profiteers, and peddlers." Schaumburg, 444 U.S. at 644, 100 S.Ct. at 840 (Rehnquist, J., dissenting).
 
 
 47
 The district court attempted to discredit this difference by suggesting that historically begging has not been considered a malum in se. Similarly, the plaintiffs warn that the prohibition of begging is "a stark departure ... from our Judeo-Christian tradition." We are not unaware that the giving of alms has long been considered virtuous in our Western tradition. In antiquity the humanist and jurist, Cicero, said of Caesar: "Of all thy virtues none is more marvelous and graceful than charity." Some centuries later the Christian thinker, Augustine of Hippo, observed that it is essential to the virtue that "charity obeys reason, so that charity is vouchsafed in such a way that justice is safeguarded, when we give to the needy." In Medieval times the Jewish philosopher, Moses Maimonides, espoused a charity such that "no contribution should be made without the donor feeling confident that the administration is honest, prudent and capable of management." The district court itself stated that "[i]n early English common law, begging by those able to work was prohibited, but beggars who were unable to work were licensed and restricted to specific areas." Thus, while there can be no doubt that giving alms is virtuous, in the Western tradition there is also no doubt that the virtue is best served when it reflects an "ordered charity." It does not seem to us that the TA's regulation of solicitation and ban on begging are inconsistent with the concept. Although this discussion is certainly not determinative of the legal issues now before us, we mention it here only because both the plaintiffs and the district court have attributed a fair amount of weight to it. We take this opportunity, therefore, to suggest that it is not the role of this court to resolve all the problems of the homeless, as sympathetic as we may be. We must fulfill the more modest task of determining whether the TA may properly ban conduct that it finds to be inherently harmful in the subway system.
 
 C. The O'Brien Standard
 
 48
 Assuming arguendo that begging and panhandling possess some degree of a communicative nature, we next inquire whether the district court correctly determined the enforcement of 21 N.Y.C.R.R. Sec. 1050.6 to be violative of the First Amendment. The threshold question here is what level of judicial scrutiny to apply in evaluating the regulation. Government regulation of expressive conduct may abridge speech in either of two ways. See generally L. Tribe, American Constitutional Law Sec. 12-2 (2d ed. 1988) (appropriately enough characterizing the levels of scrutiny as "track one" and "track two"). " 'A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires.' " Texas v. Johnson, 109 S.Ct. at 2540 (emphasis in original) (quoting Community for Creative Non-Violence v. Watt, 703 F.2d at 622-23 (Scalia, J., dissenting)). Alternatively, a regulation may proscribe particular conduct in order to protect a " 'governmental interest ... unrelated to the suppression of free expression.' " Id. (quoting O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679). In the latter case, the regulation comes under the "relatively lenient" level of judicial scrutiny represented by the O'Brien standard. Id. (citing O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679). "It is, in short, not simply the verbal or nonverbal nature of the expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid." Id.
 
 
 49
 Pursuant to O'Brien, "a government regulation is sufficiently justified" when: (1) "it is within the constitutional power of the Government;" (2) "it furthers an important or substantial governmental interest;" (3) "the governmental interest is unrelated to the suppression of free expression;" and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679. See also City Council of Los Angeles v. Taxpayers For Vincent, 466 U.S. at 805, 104 S.Ct. at 2128. In its application of O'Brien, the Supreme Court has "highlighted" the importance of the third requirement, and seems to have adapted it as a threshold inquiry, the answer to which determines on which track to proceed. See Texas v. Johnson, 109 S.Ct. at 2541. Once the third requirement has been satisfied, the Supreme Court has indicated that the O'Brien standard " 'in the last analysis is little, if any, different from the standard applied to time, place or manner restrictions.' " Id. at 2540 (quoting Clark, 468 U.S. at 298, 104 S.Ct. at 3071). See also FW/PBS, Inc. v. City of Dallas (Paris Adult Bookstores II), --- U.S. ----, 110 S.Ct. 596, 614, 107 L.Ed.2d 603 (1990) (White, J., joined by Rehnquist, C.J., concurring) ("Time, place, and manner restrictions are not subject to strict scrutiny and are sustainable if they are content neutral, designed to serve a substantial governmental interest, and do not unreasonably limit alternative means of communication.").
 
 
 50
 In the present case, there is no indication that the district court ever inquired as to which level of judicial scrutiny is appropriate. Instead, the district court seemed to presume that the conduct at issue deserved full First Amendment protection. We think the omission and presumption were fatal to the district court's reasoning, since the regulation at issue runs squarely onto track two, under the relaxed O'Brien standard. Generally speaking, this more lenient level of judicial scrutiny requires us to weigh the extent to which expression is in fact inhibited against the governmental interest in proscribing particular conduct. See L. Tribe, American Constitutional Law Sec. 12-23, at 979 (2d ed. 1988) ("To be weighed in the balance are, on the one hand, the extent to which communicative activity is in fact inhibited; and, on the other hand, the values, interests, or rights served by enforcing the inhibition."). Here, on balance, the governmental interests must prevail.
 
 
 51
 The first O'Brien requirement is not genuinely at issue. Although the plaintiffs asserted in the original complaint that Sec. 1050.6 was outside the rule-making authority conferred on the TA, their claim is entirely passed over in the district court's Opinion and Order. The TA, in fact, has a broad statutory mandate to promulgate rules "governing the conduct and safety of the public as it may deem necessary, convenient or desirable, ... including without limitation rules relating to the protection or maintenance of such facilities [and] the conduct and safety of the public." N.Y.Pub.Auth.Law Sec. 1204.
 
 
 52
 Second, the regulation advances substantial governmental interests. A majority of the subway's over three million daily passengers perceive begging and panhandling to be "intimidating", "threatening", and "harassing". The conduct often involves "unwanted touching [and] detaining" of passengers. The police have great difficulty distinguishing between "panhandling and extortion". Begging is "inherently aggressive" to the "captive" passengers in the close confines of the subway atmosphere. Based on these facts, it is fair to say that whether intended as so, or not, begging in the subway often amounts to nothing less than assault, creating in the passengers the apprehension of imminent danger. Additionally, begging in the subway raises legitimate concerns about public safety. The conduct "disrupts" and "startles" passengers, thus creating the potential for a serious accident in the fast-moving and crowded subway environment. In short, the TA's judgment that begging is alarmingly harmful conduct that simply cannot be accommodated in the subway system is not unreasonable.
 
 
 53
 The governmental interests in the prohibition of begging in the subway are more fully elucidated when the harms to be avoided are juxtaposed with the good to be sustained. The subway is not a domain of the privileged and powerful. Rather, it is the primary means of transportation for literally millions of people of modest means, including hard-working men and women, students and elderly pensioners who live in and around New York City and who are dependent on the subway for the conduct of their daily affairs. They are the bulk of the subway's patronage, and the City has an obvious interest in providing them with a reasonably safe, propitious and benign means of public transportation. In determining the validity of the ban, we must be attentive lest a rigid, mechanistic application of some legal doctrine gainsays the common good. In our estimation, the regulation at issue here is justified by legitimate, indeed compelling, governmental interests. We think that the district court's analysis reflects an exacerbated deference to the alleged individual rights of beggars and panhandlers to the great detriment of the common good.
 
 
 54
 Third, the regulation relies on governmental interests unrelated to the suppression of free expression. As previously noted, the Supreme Court has "highlighted" the significance of this third O'Brien factor. Texas v. Johnson, 109 S.Ct. at 2540-41. The requirement that the governmental interest at stake be unrelated to the suppression of free expression seems equivalent to the "content neutrality" requirement. See Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); Clark v. Community for Creative Non-Violence, 468 U.S. at 295, 104 S.Ct. at 3070 (The regulation "is content-neutral and is not being applied because of disagreement with the message presented."). In Ward v. Rock Against Racism, the Court stated: "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." 109 S.Ct. at 2754. Facially, Sec. 1050.6, of course, has nothing to do with a restriction on expression. In determining whether the governmental interest is content neutral and unrelated to the suppression of free expression, the real question must be whether the dangers relied on as justification for the regulation arise at least in some measure from the alleged communicative content of the conduct.
 
 
 55
 For example, in striking down a Texas statute that rendered desecration of the flag unlawful, the Supreme Court noted the statute was directly "aimed at protecting onlookers from being offended by the ideas expressed by the prohibited activity." Texas v. Johnson, 109 S.Ct. at 2543, n. 7. Similarly, in Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court reversed the conviction of a defendant under a California penal statute for offensive conduct as a result of wearing a jacket into a courthouse on which were visible the words "F__k the Draft". The Court reasoned this "vulgar allusion" and "unseemly expletive" was protected since "[t]he only 'conduct' which the State sought to punish ... [was] the fact of communication." Id. at 18, 20, 23, 91 S.Ct. at 1784, 1785, 1787.
 
 
 56
 In contrast to Texas v. Johnson and Cohen, the governmental interests in O'Brien concerned the preservation of the selective service system which would have been equally threatened if the conduct of burning a draft card was totally bereft of a communicative character. If, for example, O'Brien had destroyed the card in private with no witnesses, the governmental interest in prohibiting the destructive conduct in order to protect the smooth and proper functioning of the selective service system would have been unchanged. O'Brien, 391 U.S. at 375, 88 S.Ct. at 1678. As the Supreme Court explained, O'Brien's conduct "willfully frustrated" the governmental interest, and consequently, he was convicted "[f]or this noncommunicative impact of his conduct, and for nothing else." Id. at 382, 88 S.Ct. at 1682. The Court pointed out: "The case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." Id.
 
 
 57
 Like O'Brien, the case now at bar involves proscription of conduct for reasons completely unrelated to the alleged communicative impact of the conduct. There is nothing in the record to suggest even remotely that the TA's interests in stopping begging arise because the TA objects to a particularized idea or message. To the contrary, the TA regulation is simply not directed at any expressive aspect of the proscribed conduct. In fact, under the amended TA rules, the message may be expressly delivered. Quite apart from any particularized idea or message it might arguably possess, begging poses significant dangers to the subway system. The conduct threatens passenger well-being and safety as well as disrupts the system's smooth operation. These dangers, independent of the alleged communicative character of begging, give rise to the regulation. Even if begging had no communicative character at all, these independent dangers would be just as real, and consequently, there would remain a substantial governmental interest in prohibiting the conduct in the subway. It seems evident to us that the regulation is content neutral, and is justified on the ground that it serves legitimate governmental interests totally unrelated to the suppression of free expression.
 
 
 58
 Finally, the exigencies created by begging and panhandling in the subway warrant the conduct's complete prohibition. It is now well-settled that regulations restricting the time, place or manner of expressive conduct do not violate the First Amendment "simply because there is some imaginable alternative that might be less burdensome on speech." United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). Commenting on the fourth O'Brien factor, the Supreme Court made this point painstakingly clear:
 
 
 59
 Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."
 
 
 60
 Ward v. Rock Against Racism, 109 S.Ct. at 2757-58 (emphasis added) (quoting Albertini, 472 U.S. at 689, 105 S.Ct. at 2906) (footnote omitted) (ellipses in original).
 
 
 61
 The Supreme Court's clear statement notwithstanding, the district court reasoned that the prohibition was not a reasonable time, manner or place restriction because "different TA regulations ... already prohibit conduct which has 'the reasonably intended effect of annoying, alarming or inconveniencing others, or otherwise tend[s] to create a breach of peace,' [citation omitted], which 'interferes with the provision of transit service or obstruct[s] the flow of traffic on facilities or conveniences,' [citation omitted], or which 'causes or may tend to cause harm or damage to any person....' " In other words, the district court concluded that the regulation prohibiting begging was invalid since the TA already had at its disposal a less restrictive alternative. Such reasoning flies directly in the face of the tenet quoted above that the narrow tailoring requirement is met when "a substantial government interest [ ] would be achieved less effectively" absent the regulation. A "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward v. Rock Against Racism, 109 S.Ct. at 2758.
 
 
 62
 The district court further reasoned that since the TA regulation allows some solicitation by organized charities in certain areas of the subway system, the TA must permit individual beggars and panhandlers to do the same. According to the Kelling affidavit, TA experience demonstrates that "panhandling leads both to more panhandling and to more aggressive panhandling in the transit system." Indeed, "aggressive" and "intimidating" begging and panhandling have been observed in virtually every part of the subway system, in subway cars and on platforms, escalators, steps and walkways. Based on its experience, the TA obviously reached a judgment that the only effective way to stop begging in the system was through the enforcement of a total ban. The TA's judgment is consistent with the Supreme Court's rule that the "narrow tailoring" requirement is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward v. Rock Against Racism, 109 S.Ct. at 2759; see N.Y. City Unemployed & Welfare Council v. Brezenoff, 742 F.2d 718, 721 (2d Cir.1984) ("A blanket prohibition of a particular type of speech in a public forum may sometimes be a reasonable time, place or manner restriction.").
 
 
 63
 In addition, the regulation at issue "leave[s] open ample alternative channels of communication." Ward v. Rock Against Racism, 109 S.Ct. at 2760. Under the regulation, begging is prohibited only in the subway, not throughout all of New York City. It is untenable to suggest, as do the plaintiffs, that absent the opportunity to beg and panhandle in the subway system, they are left with no means to communicate to the public about needy persons. Previously, the Supreme Court rejected a similar claim that a government ban on overnight sleeping in Lafayette Park, in Washington, D.C., impermissibly limited the means of communicating a message about the plight of the homeless. Clark v. Community for Creative Non-Violence, 468 U.S. at 295, 104 S.Ct. at 3070. As the Court noted: "Respondents do not suggest that there was, or is, any barrier to delivering to the media, or to the public by other means, the intended message concerning the plight of the homeless." Id; see also City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54, 106 S.Ct. 925, 932, 89 L.Ed.2d 29 (1986) (upholding a city ordinance that prohibited adult movie theaters within 1,000 feet of any residential zone, family dwelling, church, park or school since it left 520 acres or about five percent of the city land available for such theaters). While emphasizing the total prohibition of begging in the subway, the district court failed to address the fact that there has been no showing in this case that the remaining avenues of communication are inadequate.
 
 
 64
 Essentially, the district court saw fit to substitute its judgment for the TA's experience and expertise in operating the subway system. In so doing, the district court contravened the fundamental principle of the judicial deference owed to officials in carrying out their responsibilities based on expertise and experience. Respecting this principle, the Supreme Court, in Clark v. Community for Creative Non-Violence, 468 U.S. at 299, 104 S.Ct. at 3072, concluded:
 
 
 65
 We do not believe, however, that either United States v. O'Brien or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.
 
 
 66
 To paraphrase the High Court, we can only conclude in the instant case that the district court improperly decided to replace the TA as manager of the subway system and falsely assumed the competence to judge how much protection of the system and its passengers is wise and how that level of safe public transportation is to be attained.
 
 
 67
 In sum, even if begging and panhandling constitute protected expressive conduct, which is in serious doubt, we hold that the regulation at issue more than satisfies the O'Brien standard, and thus is not in violation of the First Amendment.
 
 D. Public Forum Analysis
 
 68
 Although it is not necessary to our holding in this case, we briefly turn our attention to the district court's conclusion that the subway is a public forum in which begging and panhandling must be permitted. Since the amended 21 N.Y.C.R.R. Sec. 1050.6 permits organizations to solicit, the district court reasoned that the TA "tacitly acknowledges that solicitation of money [by beggars and panhandlers] is appropriate in segments of the transit system." Based on this reasoning, the district court discounted our holding in Gannett Satellite, 745 F.2d at 773, that the subway is not a traditional or designated public forum, and concluded that any area of the subway system where charitable solicitation is permitted, including platforms and mezzanines, is therefore a public forum where begging and panhandling must be permitted. However, it is clear that "[t]he government does not create a public forum ... by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius v. NAACP Legal Defense & Educational Fund, 473 U.S. at 802, 105 S.Ct. at 3449.
 
 
 69
 The district court's conclusion misapprehends the TA's intent in revising the regulation. As the Supreme Court has explained: "We will not find that a public forum has been created in the face of clear evidence of a contrary intent, ... nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." Id. at 803, 105 S.Ct. at 3449. Moreover, "[i]n cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum." Id. at 804, 105 S.Ct. at 3450. In the face of Operation Enforcement, there can be no doubt that the TA intended to continue its long-standing prohibition of begging and panhandling even after revising the regulation to permit solicitation by organizations.
 
 
 70
 Further, it is permissible for the TA to limit solicitation in the subway system to organizations. "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. Id. at 802, 105 S.Ct. at 3449 (emphasis added); see Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 n. 7, 103 S.Ct. 948, 955 n. 7, 74 L.Ed.2d 794 (1983) (A designated public forum "may be created for a limited purpose such as use by certain groups."); Calash v. City of Bridgeport, 788 F.2d 80, 84 (2d Cir.1986) ("[A] public forum can be created for use only by certain speakers or for discussion of certain topics."); Deeper Life Christian Fellowship, Inc. v. Board of Education, 852 F.2d 676, 680 (2d Cir.1988) (same).
 
 
 71
 Thus, the TA never intended to designate sections of the subway system, including platforms and mezzanines, as a place for begging and panhandling. Nor does the amended regulation abrogate our holding in Gannett Satellite that the subway system is not a traditional or designated public forum. The amended regulation demonstrates the TA's concern to safeguard the system and to honor the First Amendment. Confronted with the district court's holding, a cynic might remind the TA that "no good deed goes unpunished."
 
 E. N.Y. Penal Law Sec. 240.35(1)
 
 72
 We now turn our attention to the district court's conclusion that N.Y. Penal Law Sec. 240.35(1) violates the due process clause of the New York State Constitution. The district court reached the conclusion solely on the basis of its interpretation of several New York State cases, relying in particular on a recent opinion of the New York Court of Appeals, People v. Bright, supra. Our primary concern is whether consideration of this issue was properly within the district court's jurisdiction. The question of whether the court properly exercised jurisdiction may be raised by this Court, itself, at any stage of the proceedings. Manway Construction Co. v. Housing Authority of Hartford, 711 F.2d 501, 503 (2d Cir.1983).
 
 
 73
 First, we are doubtful that plaintiffs have alleged an actual "case or controversy," as required by Article III of the United States Constitution. See City of Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983); Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 297-98, 99 S.Ct. 2301, 2308-09, 60 L.Ed.2d 895 (1979). To satisfy this constitutionally-mandated jurisdictional requirement,
 
 
 74
 [p]laintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions.... Abstract injury is not enough. The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."
 
 
 75
 Lyons, 461 U.S. at 101-02, 103 S.Ct. at 1664-65 (citations omitted). As it relates to the issue of whether Sec. 240.35(1) comports with the New York State Constitution, we do not think that this fundamental prerequisite of jurisdiction has been satisfied.
 
 
 76
 Initially, the New York Penal Law was simply not at issue in this case. In the original complaint, the plaintiffs alleged violations of their rights as a result of the TA's enforcement of 21 N.Y.C.R.R. Sec. 1050.6(b) in the subway system. They never maintained that any of the defendants, in fact, stopped them from begging and panhandling pursuant to the N.Y. Penal Law Sec. 240.35(1). By instructing the plaintiffs to challenge Sec. 240.35(1), the district court designed a much different case than the controversy that originally came before the court. From the outset, the role of Metro-North, an original defendant in the case, had been dubious since the commuter railroad was not empowered to enforce the TA ban on begging and panhandling pursuant to Sec. 1050.6. The challenge to Sec. 240.35(1) enabled the district court to exercise jurisdiction over Metro-North, as well as the LIRR, the Port Authority and conceivably any other defendant empowered to enforce this provision of the New York Penal Law. At a minimum, the scope of the case was expanded beyond the subway to include facilities such as Grand Central Station, Pennsylvania Station, the Port Authority Bus Terminal and the World Trade Center.
 
 
 77
 In its Opinion and Order dated January 25, 1990, the district court indicated that its sua sponte "action was prompted by defendants' assertion that transit police, as duly authorized peace officers, were doing no more than enforcing that provision [Sec. 240.35(1) ] of the state penal law." The court was apparently referring to a statement made by the TA in a memorandum filed November 30, 1989 submitted in opposition to the motion for a preliminary injunction. The memorandum observed that the TA regulation at issue was "comparable to a New York State Penal provision prohibiting loitering, remaining or wandering about in a public place 'for the purpose of begging' N.Y. Penal Law Sec. 240.35." Based on this observation, the district court raised and discussed the issue at length during the first oral argument, subsequently attempted to join the Attorney General so as to call the state statute into question, and finally, at the second oral argument, instructed the plaintiffs to amend the complaint accordingly.
 
 
 78
 Subject matter jurisdiction may not be created either by the parties, or by the court. The record is devoid of any allegation that the plaintiffs have been prohibited from begging or panhandling on the basis of Sec. 240.35(1). The TA prohibition of begging is based on its own regulations, not on the New York Penal Law. The Port Authority represented during this litigation that, on the basis of Sec. 240.35(1), it would not issue a permit to beg pursuant to 21 N.Y.C.R.R. Secs. 1220.16, 1220.25 and 1290.3. However, the plaintiffs have never requested, nor have they been denied, a permit to beg by the Port Authority. Indeed, while plaintiffs admit to begging in the Port Authority facilities, they do not allege that they have ever been requested to desist or to leave by any Port Authority official. Nor do the plaintiffs suggest that anyone has ever been arrested or prosecuted for begging or panhandling in the Port Authority pursuant to Sec. 240.35(1). At most, the plaintiffs have alleged an "abstract" and "hypothetical," rather than a "real and immediate," possibility of injury. Lyons, 461 U.S. at 101-02. When one cuts through the procedural labyrinth of this case, it becomes clear that the district court, and not the plaintiffs, raised the New York Penal Law as an issue. As we have noted previously, "[p]rocedural irregularities almost always breed confusion, the great enemy of justice." United States v. Town of North Hempstead, 610 F.2d 1025, 1031 (2d Cir.1979).
 
 
 79
 Based on the plaintiffs' failure to apply to the Port Authority for a permit to beg prior to challenging its reliance on Sec. 240.35(1), we must conclude that they have failed to allege either a direct injury or an imminent danger of injury resulting from the challenged provision of the New York Penal Law. See Berrigan v. Norton, 451 F.2d 790 (2d Cir.1971) (Where two prisoners failed to request, and the warden never denied, permission to engage in First Amendment activity outside the prison, the court lacked jurisdiction to consider the prisoners' claims of constitutional violations as they did not present a justiciable case or controversy.). Accordingly, this aspect of their complaint must be dismissed.
 
 
 80
 Even if the plaintiffs had alleged a justiciable case or controversy, the district court would have lacked subject matter jurisdiction over this issue. The jurisdiction of the district courts is limited not only by the Constitution, but also by Congress. See Town of North Hempstead, 610 F.2d at 1029. It seems clear that the district court properly exercised its jurisdiction over plaintiffs' First Amendment claims pursuant to 28 U.S.C. Sec. 1331. However, the constitutionality under the New York State Constitution of a New York Penal Law provision presents no federal questions. Consequently, the district court's adjudication of this issue would only be permissible if the issue properly fell within the court's pendent jurisdiction. See Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988); United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); Town of North Hempstead, 610 F.2d at 1029.
 
 
 81
 An exercise of pendent jurisdiction is appropriate when "the federal and state claims are sufficiently related so as to be considered to 'comprise but one constitutional "case" ', the test of relatedness being whether the claims 'derive from a common nucleus of operative fact.' " Town of North Hempstead, 610 F.2d at 1030 (citation omitted). Although the doctrine of pendent jurisdiction is one of flexibility and discretion, it is fundamental that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted). A district court ought not "reach out for ... issues, thereby depriving state courts of opportunities to develop and apply state law." Mayer v. Oil Field Systems Corp., 803 F.2d 749, 757 (2d Cir.1986). These same principles underlie our 11th Amendment jurisprudence:
 
 
 82
 A federal court's grant of relief against state officials on the basis of state law ... does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism....
 
 
 83
 Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Thus, pendent jurisdiction should not be exercised merely because "the exercise of such judicial power is desirable or expedient." Town of North Hempstead, 610 F.2d at 1029.
 
 
 84
 Applying these principles to the case at bar, we fail to see a sufficient relationship between the First Amendment challenge to the TA's prohibition against begging and the challenge, based on the due process clause of the New York State Constitution, to N.Y. Penal Law Sec. 240.35(1). The federal constitutional claim raises legal issues completely unrelated to those presented by the state constitutional claim. The fact that the TA's prohibition on begging is unconnected to the New York Penal Law deprives the claims of the requisite "common nucleus of operative fact" for the exercise of pendent jurisdiction. See Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138; Town of North Hempstead, 610 F.2d at 1029-30. Moreover, exercising pendent jurisdiction in this case would violate fundamental principles of federalism and comity. New York State has a definite interest in determining whether its own laws comport with the New York Constitution. A proper determination may well involve ascertaining the state legislature's intention in passing Sec. 240.35(1), as well as interpreting prior decisions of the New York courts. We think the federal district court was ill-disposed to undertake such a task.
 
 CONCLUSION
 
 85
 We hold that 21 N.Y.C.R.R. Sec. 1050.6 does not violate the First Amendment, and consequently, we reverse and vacate the district court's judgment permanently enjoining the various defendants from enforcing a prohibition against begging in their respective public transit facilities. In addition, we vacate the district court's judgment declaring that N.Y. Penal Law Sec. 240.35(1) violates the New York State Constitution.
 
 
 86
 MESKILL, Circuit Judge, concurring in part and dissenting in part:
 
 
 87
 I concur with the majority opinion insofar as it vacates the district court's invalidation of N.Y. Penal L. Sec. 240.35(1) (McKinney 1989). With respect to the First Amendment issues, however, the difficult question for me is whether any legally justifiable distinction can be drawn between begging for one's self and solicitation by organized charities. I am unable to do so, and therefore I respectfully dissent from the Court's disposition of these claims.
 
 
 88
 According to the majority, common sense tells us that begging enjoys no First Amendment protection because it is conduct unassociated with any particularized message and because begging, unlike "charitable solicitation," is mere solicitation for money with a diminished communicative content. I agree that common sense and everyday experience should inform our decision. Their true teaching, however, is that both beggars and organized charities who send representatives into the subway have one primary goal: in the words of the majority, "the transfer of money." Nevertheless, in Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), the Supreme Court saw fit to extend First Amendment protection to the fundraising efforts of organized charities. In my opinion, beggars deserve that same protection.
 
 
 89
 In Schaumburg, the Court held that charitable solicitation is protected because it "is characteristically intertwined with ... speech seeking support for particular causes or for particular views on economic, political, or social issues." 444 U.S. at 632, 100 S.Ct. at 834. Notably, the Court did not suggest that charitable solicitation is protected expression because it is always accompanied by speech on social issues. If that were the test, then it is doubtful that any organized charity soliciting contributions in the New York subway would be engaged in protected expression. Those charities receive countless donations without engaging in any discussion whatsoever with the typical donor rushing to catch a train. Rather, the Schaumburg Court held that First Amendment protection attaches to all charitable solicitation, whether or not any speech incident to the solicitation actually takes place, because a sufficient nexus exists between a charity's expression of ideas and its fundraising. That is, a charity's representatives often explain the purpose of the charity's work to potential donors and perhaps engage in a discussion regarding social issues. In addition, the receipt of donations is essential to the continued existence of a charity. The record in the present case, as well as the common experience of those who ride the New York subways, indicates that begging is protected expression for exactly the same reasons.
 
 
 90
 Plaintiffs Young, Walley and Gilmore all state in their affidavits that they often speak with potential donors about subjects such as the problems of the homeless and poor, the perceived inefficiency of the social service system in New York and the dangerous nature of the public shelters in which they sometimes sleep. The speech and association inherent in these encounters is without doubt protected by the First Amendment. See, e.g., Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Similarly, a beggar who holds a sign saying "Help the Homeless" or "I am hungry" is engaged in First Amendment activity. See Cohen v. California, 403 U.S. 15, 18-19, 91 S.Ct. 1780, 1784-85, 29 L.Ed.2d 284 (1971) (person wearing jacket with anti-war slogan engaged in protected expression of views). Any attempt to distinguish between beggars who hold signs or engage in discussions and those who simply ask for money would be unrealistic. Accordingly, if First Amendment protection extends to charitable solicitation unaccompanied by speech, as it apparently does, it must extend to begging as well. See Riley v. National Federation of the Blind, Inc., 487 U.S. 781, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988) (Schaumburg "refused to separate the component parts of charitable solicitations from the fully protected whole"); see also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 764-65, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976) (holding commercial speech to be protected although "not all commercial messages contain the same or even a very great public interest element").
 
 
 91
 The majority suggests that plaintiffs are free to engage in First Amendment activity in the subway provided that they do not request donations. This is precisely the argument that was rejected in Schaumburg as "represent[ing] a far too limited view of [the] ... cases relevant to canvassing and soliciting by religious and charitable organizations." 444 U.S. at 628, 100 S.Ct. at 831. The rationale for the Supreme Court's rejection of this argument was that charitable organizations would be unable to continue their advocacy and dissemination of ideas without the ability to solicit donations. 444 U.S. at 632, 100 S.Ct. at 833. The majority acknowledges the importance of contributions to a charitable organization's work, but fails to recognize that a beggar's First Amendment activity is no less dependent on his requests for money. In the seclusion of a judge's chambers, it is tempting to assume that beggars could obtain jobs and spend their free time distributing leaflets or buttonholing passersby in the subway to further the cause of the homeless and poor. The record in this case, however, permits no such speculation. Plaintiff Young states in his affidavit, for example, that he solicits money in the subway so that he can buy food, medicine and other essentials, and take the subway to the Bronx, where he sometimes earns enough money unloading trucks to rent a room for the night. He receives no public assistance. Plaintiff Walley, who is fifty years old, states that he solicits donations because he is unable to find work. If he sleeps in a shelter, he receives reduced public assistance of $21.50 every two weeks. Plaintiff Gilmore's solicitation also is the result of her need for food and medical treatment. To suggest that these individuals, who are obviously struggling to survive, are free to engage in First Amendment activity in their spare time ignores the harsh reality of the life of the urban poor.
 
 
 92
 Because begging is speech protected by the First Amendment, it is necessary to determine whether the TA regulations withstand the proper level of scrutiny. I agree with the majority that the TA's regulation is content-neutral. Defendants have offered substantial evidence to support their claim that the regulations are aimed at the secondary effects of begging such as increased crime and traffic congestion, rather than at any message conveyed by the beggars. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (zoning restriction applicable to adult movie theaters content-neutral because aimed at secondary effects of such theaters); see also Boos v. Barry, 485 U.S. 312, 320-21, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988) (discussing Renton ). I have serious doubts, however, that holding the regulation content-neutral automatically means that it must be analyzed under what the majority terms the "relaxed" standard of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). I question the application of O'Brien for two reasons. First, begging, like charitable solicitation, is protected speech, and therefore a direct restriction on it must be "subjected ... to exacting First Amendment scrutiny." Riley, 108 S.Ct. at 2673. Second, O'Brien has generally been applied to cases involving symbolic conduct rather than speech in the normal sense of the word. See Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (applying time, place or manner analysis to content-neutral regulation and referring to O'Brien as "the case in which we established the standard for judging the validity of restrictions on expressive conduct"). The protected expression in this case is the beggars' speech incident to their solicitation of alms, not symbolic conduct.
 
 
 93
 As the majority apparently recognizes, however, it makes little difference whether the regulations in issue are judged under O'Brien or under the traditional time, place or manner standard because the two tests are essentially the same with respect to content-neutral regulations. See Rock Against Racism, 109 S.Ct. at 2757; Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984); see also id. at 308 n. 6, 104 S.Ct. at 3076 n. 6 (Marshall, J., dissenting). The only element of O'Brien on which I disagree with the majority is the fourth, namely, whether the regulation is no greater than is essential to the furtherance of the government's interest. This element corresponds to the narrow tailoring requirement of the time, place or manner analysis. Because no symbolic speech is involved here, I will use the time, place or manner analysis that applies to speech in a public forum.
 
 
 94
 The TA clearly has created a limited public forum by designating certain areas of the subway system in which charitable solicitation may take place. The majority emphasizes that the TA never intended to open the subway to begging, and that the grant of selective access does not create a public forum for all purposes. While the government's intent is "critical" to the determination that a limited public forum was created, see Deeper Life Christian Fellowship, Inc. v. Board of Educ., 852 F.2d 676, 680 (2d Cir.1988), the fact is defendants intended to open, and did open, certain areas to solicitation by organized charities. Simply put, the TA designated certain areas in which charitable groups could ask passersby for money. As discussed above, begging is indistinguishable from charitable solicitation for First Amendment purposes. To hold otherwise would mean that an individual's plight is worthy of less protection in the eyes of the law than the interests addressed by an organized group. No court has ever so ruled. Defendants therefore may not open the door to the latter while slamming it in the face of the former. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 48, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983) (designated public forum open "to other entities of similar character"). This conclusion is further compelled by defendants' failure to submit any evidence that charitable solicitation does not have the same adverse effects (e.g., impeding traffic, intimidating passengers) that begging is claimed to have.[1] In the absence of such evidence, defendants' contention that begging is not of the same general nature as solicitation by organized charities is nothing more than rank speculation.
 
 
 95
 I cannot agree that Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority, 745 F.2d 767 (2d Cir.1984), is dispositive of the status of the subway as a public forum. Gannett involved a challenge to a licensing scheme for the placement of newspaper vending machines in commuter railroad stations, not the New York City subway. Id. at 770-71. Even if Gannett's holding that those commuter stations are neither traditional nor designated public forums could be extended to the subway, the district court was correct in holding that Gannett has little precedential value in the present case because it was decided prior to the TA's creation of a designated forum for charitable solicitation.
 
 
 96
 The status of the Port Authority Bus Terminal as a public forum was established in Wolin v. Port of New York Authority, 392 F.2d 83, 88-91 (2d Cir.) (suggesting that Port Authority is a traditional public forum), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968), and defendants present no persuasive argument that Wolin is no longer good law. Furthermore, no re-examination of Wolin is necessary in this case because it is clear that those areas in which the Port Authority allows expressive activities to take place constitute a designated public forum for the same reasons set forth above with respect to the subway system.
 
 
 97
 Because I believe that, in light of Supreme Court precedent, begging is protected expression and that the areas in which it is currently banned are public forums, I next turn to the question whether the regulations in issue can survive the appropriate level of scrutiny. Content-neutral regulations like the ones in question will be upheld as reasonable time, place or manner restrictions if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. at 955; see also Frisby v. Schultz, 487 U.S. 474, 479-80, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988).
 
 
 98
 While the interests that defendants advance are certainly significant, e.g., protection of the public from harassment, preservation of the quality of life, and maintenance of a safe transit system, the regulations are not narrowly tailored to achieve these interests because they burden a substantial amount of speech that does not implicate the TA's interests. The majority is correct that even a complete ban may in some instances constitute a reasonable time, place or manner restriction, see, e.g., Community for Creative Non-Violence, 468 U.S. at 296, 104 S.Ct. at 3070, and that a regulation need not be the least restrictive means of achieving the government's objective in order to be narrowly tailored. See Rock Against Racism, 109 S.Ct. at 2757-58 (narrow tailoring requirement met as long as government interest would be achieved less effectively absent the regulation and it does not burden substantially more speech than necessary). As the district court noted, however, the regulations in this case do not distinguish between passive begging such as a blind man rattling a cup full of change or a homeless person politely requesting money, which would hardly daunt the average New Yorker, and aggressive behavior such as the panhandler who accosts and intimidates subway riders. The evidence submitted by the TA indicates that this aggressive, intimidating behavior is the primary evil that prompted the TA's ban on begging. For example, Bernard Jacobs, a Detective of the New York City Transit Police Department, supports the ban on begging by stating in his affidavit that "passengers feel harassed and intimidated by panhandlers." Similarly, Carl Green, Assistant Vice President for Government Relations of the TA, states that "[t]he policy dictating enforcement of the [ban on begging] is directed against behavior which [our] passengers believe to be intimidating." The TA certainly is free to prevent harassing, intimidating behavior, which existing regulations allow it to do. See Texas v. Johnson, 109 S.Ct. 2533, 2542 (1989) (existence of a statute specifically prohibiting breaches of the peace "tends to confirm that Texas need not punish ... flag desecration in order to keep the peace"). The TA has made no showing, however, that passengers perceive all, or even a large percentage, of people who solicit alms in the subway as belligerent or frightening. In addition, there has been no showing that subway riders do not feel harassed when approached by representatives of an organized charity. Thus, the TA may protect its passengers by prohibiting the specific conduct that adversely affects the subway environment, and may address safety concerns such as traffic flow by restricting peaceful begging to areas in which charitable solicitation is allowed. See Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 966-67, 104 S.Ct. 2839, 2852, 81 L.Ed.2d 786 (1984) (restriction on fundraising not sufficiently narrowly tailored to achieve state's interest of preventing fraud). The complete ban on begging, however, burdens substantially more speech than necessary, and therefore is not narrowly tailored to achieve the government's interests. See Rock Against Racism, 109 S.Ct. at 2758; Frisby, 487 U.S. at 485, 108 S.Ct. at 2502 (complete ban is narrowly tailored "only if each activity within the proscription's scope is an appropriately targeted evil").
 
 
 99
 In sum, begging is speech protected by the First Amendment that may be regulated, but not entirely prohibited, to achieve the government interests advanced in this case. I recognize that the presence of large numbers of beggars in the subway presents a serious problem for the TA and contributes to the sense of chaos and frustration experienced by the many hard-working New Yorkers who rely on the subway system. Had the TA's regulations continued to bar all charitable solicitation in the subways, I would uphold them because no public forum would have been created. I simply fail to see why the TA should be able to permit organized charities, but not beggars, to rattle a cup full of change as one passes by.
 
 
 100
 For the foregoing reasons, I respectfully dissent.
 
 
 
 [1]
 The district court accepted the parties' stipulation that any difference in the meaning of the terms is not significant for the purposes of this litigation
 
 
 [1]
 The majority notes that the record contains no indication that passengers feel intimidated by organized charities, and concludes that this absence of evidence supports the TA's distinction between begging and charitable solicitation. The reason for this lack of evidence is that, while the TA engaged in an enormous effort to gauge passenger reaction to begging, it never inquired how subway riders felt about being accosted by representatives of organized charities