Celestus BLAIR, Jr., Plaintiff,

v.

Steven SHANAHAN, individually and in his official capacity, James Lassus, individually and in his official capacity, Stephen Paulson, individually and in his official capacity, Christopher Breen, individually and in his official capacity, Jeffrey Levin, individually and in his official capacity, Frank Jordan, individually and in his official capacity, and the City and County of San Francisco, Defendants.

No. C–89–4176 WHO.

United States District Court, N.D. California.

Sept. 24, 1991.

As Amended Oct. 8, 1991.

Michael C. Hallerud, Robert J. Keyes, D. Kirk Jamieson, Nancy L. Asbill, Pettit & Martin, Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, Matthew A. Coles, American Civil Liberties Union, San Francisco, Cal., for plaintiff.

Louise H. Renne, City Atty., George A. Riley, Randy Riddle, G. Scott Emblidge, Deputy City Attys., Enid A. Camps, Deputy Atty. Gen., Attorney General's Office, San Francisco, Cal., for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

In this civil rights action, plaintiff, Celestus Blair, Jr., a former panhandler, seeks compensatory and punitive damages from defendants, San Francisco police officers Steven Shanahan, James Lassus, Stephen Paulson, Christopher Breen, and Jeffrey Levin (the "Arresting Officers"), the City and County of San Francisco (the "City") (the City and the Arresting Officers are collectively referred to as "defendants"), and Frank Jordan, the former Chief of Police of the City and County of San Francisco, for constitutional violations Blair suffered when arrested for allegedly violating § 647(c)[1] of the California Penal Code, injunctive relief, and a declaration from this Court that § 647(c) is unconstitutional in that it violates the First and Fourteenth Amendments to the Constitution of the United States.

Blair has brought a motion for partial summary judgment as to the ultimate liability of all defendants with the exception of Frank Jordan under 42 U.S.C. § 1983. Defendants have brought motions for summary judgment on a number of underlying issues. For the reasons set forth below, Blair's motion for partial summary judg-

1. That statute provides in relevant part that anyone "[w]ho accosts other persons in any public place or in any place open to the public for the purpose of begging or soliciting alms" is guilty of a misdemeanor. Cal.Penal Code § 647(c).

ment as to all defendants except Frank Jordan is denied; Blair's motion for a declaration that § 647(c) is unconstitutional on its face is granted; defendants' motion for summary judgment on Blair's first claim for relief (as to the statute's constitutionality under the First Amendment) is denied; defendants' motion for summary judgment on Blair's fourth claim for relief (as to the statute's constitutionality under Article I, Section 2 of the California Constitution) is granted; defendants' motion for summary judgment on Blair's ninth claim for relief (for a declaration as to the statute's constitutionality) is denied; defendants' motion for summary judgment on Blair's request for a permanent injunction against further enforcement of § 647(c) is granted; defendants' motion for summary judgment on Blair's request for damages against the City under § 1983 is denied; and defendants' motion for summary judgment on Blair's § 1983 claims for damages against the Arresting Officers, for First and Fourteenth Amendment violations only, is granted.

## I. INTRODUCTION.

Prior to October 1989, Blair lacked steady employment and was intermittently destitute and homeless. When unemployed, he relied on the charity of others. Accordingly, he frequently solicited alms from passersby on San Francisco's public streets and sidewalks.

Between November 1988 and June 1989, the San Francisco Police Department (the "SFPD") arrested Blair at least five times for begging and charged him with violating § 647(c). On each occasion, the San Francisco District Attorney declined to press charges.

This Court now faces several opposing motions for summary judgment on the issues in this case. The 1986 United States Supreme Court trilogy of *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986), *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), requires that a party seeking summary judgment identify evidence that shows the absence of a genuine issue of material fact. Once the moving party has made this showing, the nonmoving party must " 'designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56 (footnote omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). Applying this rule the Court now decides the motions in convenient order.

## II. EQUITABLE RELIEF.

■ Defendants argue that Blair lacks standing to sue for declaratory and injunctive relief because he now enjoys steady employment, no longer begs, and is unlikely to beg again in the future.[2] As the City notes, in order to maintain an action for equitable relief *alone*, Blair must do more than demonstrate "past exposure to illegal conduct"; he must demonstrate a " 'real and immediate,' not 'conjectural' or 'hypothetical' " threat that he will suffer some injury because of the SFPD's continued enforcement of § 647(c). *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted) (past exposure to illegal conduct does not give rise to a present case or controversy regarding injunctive relief; rather, Article III's case or controversy requirement precludes federal courts from considering claims for equitable relief unless the plaintiff can demonstrate that he faces a real

**2.** Blair now works for the San Francisco Municipal Railway and earns approximately $36,000 per year.

and immediate threat of future injury).[3]

Blair no longer begs. He has nowhere stated that he intends or expects to resume begging in the future. Assuming that Blair would return to begging only if he had no other way to make ends meet, a series of relatively unlikely events would have to occur before Blair would be subjected to further arrests under § 647(c); he would have to lose what appears to be a secure position, be unable to secure another job and exhaust whatever savings he may have accumulated. Thus, under *Lyons,* the possibility of Blair suffering further injury is not immediate enough to warrant a grant of standing in a proceeding *based solely* on a claim for equitable relief.

Blair's claim for injunctive relief, however, is inextricably intertwined with his personal stake in the related claims for damages. Blair's claims here are factually distinct from *Lyons* and fall squarely within a rule established by the Ninth Circuit based on such facts. The rule, derived from the cases discussed *infra,* compels the conclusion that Blair has standing to pursue his claim for equitable relief.

*Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984) (*per curiam*), as limited by *Smith v. City of Fontana,* 818 F.2d 1411 (9th Cir.1987), holds that standing for equitable relief exists if a plaintiff seeks damages and equitable relief based on the same legal theory and operative facts. In *Giles,* the plaintiff brought a single action for damages and injunctive relief against Bonneville County after the county jailer subjected her to an unjustified strip search. The court found that because the plaintiff had only one action pending against the county, the *Giles* plaintiff's situation differed from that in *Lyons,* where the lower court had severed that plaintiff's cause of action for damages from his cause of action for injunctive relief. *Giles,* 746 F.2d at 619. The *Giles* court, therefore, distinguished *Lyons,* which governed whether the plaintiff's request for an injunction

"standing alone, presented a case or controversy." 746 F.2d at 619. The *Giles* court concluded that because the plaintiff had a claim for damages against the County "a live controversy exists between her and the County" that gave her standing to pursue her injunctive relief as well. *Id.*

The *Giles* court relied on *Gonzales v. City of Peoria,* 722 F.2d 468, 481 (9th Cir.1983), which granted three plaintiffs standing to pursue injunctive relief for alleged constitutional violations. In *Gonzales,* the court found that, "unlike the situation in *Lyons,* there is no indication here that the plaintiffs' damages claims are severable from their demands for equitable relief." *Id.* at 481. *Giles* and *Gonzales* remain good law in this circuit. *See Soules v. Kauaians For Nukolii Campaign Committee,* 849 F.2d 1176, 1179, 1180 n. 6 (9th Cir.1988).

*Smith* narrowed "the exception established in *Giles*—that plaintiffs need not allege a credible threat of future injury in order to maintain a claim for equitable relief as long as they also have a claim for damages—to situations where the two claims involve the same operative facts and legal theory." 818 F.2d at 1423. Blair's claims for equitable relief and for money damages depend on identical facts and legal conclusions and, therefore, fall within the *Giles* exception to *Lyons,* as that exception is limited by *Smith.*

The factual distinctions between the *Giles* case and the *Lyons* case are apposite here. First, here, as in *Giles* and unlike *Lyons,* Blair clearly has standing under the "damages action, and there is no question that a live controversy exists" between the parties under the damages action. *Giles,* 746 F.2d at 619. *Lyons* relied extensively on *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); yet in neither of those cases did the plaintiffs have simultaneous claims for damages before the Court. For

---

**3.** "While *Lyons* itself concerned a claim for injunctive and not merely declaratory relief, the Supreme Court seems to employ the same threshold test of likelihood of recurring injury

when evaluating claims for declaratory relief as it does when evaluating claims for injunctive relief." *Smith v. Fontana,* 818 F.2d 1411, 1421 n. 17 (9th Cir.1987) (citation omitted).

example, in *O'Shea*, the Court specifically noted that, "[n]o damages were sought against the petitioners in this case, nor were any specific instances involving the individually named respondents set forth in the claim against these judicial officers." 414 U.S. at 492, 94 S.Ct. at 674. Here, the damages and equitable claims are inextricably intertwined and rely on the same facts and applicable law.

Second, Blair has been arrested five times for violating *a statute* that he has successfully challenged as facially unconstitutional (see discussion below). The plaintiffs' standing claims in *O'Shea*, *Rizzo*, and *Lyons* relied solely on the threat of future victimization resulting from policies that were uncertain or potentially nonexistent, which policies, depending on the circumstances, may or may not have been constitutional. In *Rizzo*, the Court noted that:

> [T]he genesis of this lawsuit—a heated dispute between individual citizens and certain policemen—has evolved into an attempt by the federal judiciary to resolve a "controversy" between the entire citizenry of Philadelphia and the petitioning elected and appointed officials over what steps might, in the Court of Appeals' words, "[appear] to have the potential for prevention of future police misconduct."

423 U.S. at 371, 96 S.Ct. at 604 (citations omitted). Clearly, that proceeding, so dramatically removed from the concrete adversity with which it began, has no factual similarity with the proceeding before this Court. Likewise, in *Lyons*, the policy allowing chokeholds was clearly constitutional under certain circumstances. The plaintiff in that case sought injunctive relief against the enforcement of that policy except when constitutionally appropriate. 461 U.S. at 98, 103 S.Ct. at 1663. There is a vast difference between a plaintiff's claim that a policy, which is properly left to the discretionary implementation of a given branch of the government, has been misapplied and may be misapplied in the future, and a plaintiff's claim that he has been arrested five times in an eight-month period under a statute that is unconstitutional on its face. Here, in short, there exists the "personal stake in the outcome" that "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675 (citations omitted).

Third, the *Lyons* court relied strongly on considerations of equity, comity, and federalism, which in that case militated towards judicial abstention concerning claims for equitable relief. Here, however, those militating factors are not present. The highest state court to rule on this facially unconstitutional statute *upheld it*. *Ulmer v. Municipal Court for Oakland–Piedmont Judicial Dist.*, 55 Cal.App.3d 263, 127 Cal. Rptr. 445 (1st Dist.1976). Defendants relied on this state court decision in devising training programs for officers, and the officers applied that training in enforcing the law on the street. Absent action by a federal court, there is no evidence that any of the defendants will cease to enforce this facially unconstitutional statute. Indeed, only a suit that resulted in a pronouncement from the California Supreme Court (requiring the plaintiff or others to endure the inherent delay and uncertainty that bringing such a suit would entail) could stop enforcement of this statute. For all these reasons, this Court finds that *Giles*, rather than *Lyons*, provides the most appropriate authority.

■ This Court has determined that Blair has standing to sue for equitable relief. He seeks an injunction against further enforcement of this statute. To gain an injunction against enforcement of the offending statute, however, Blair must demonstrate irreparable injury if an injunction does not issue. Although he has standing to assert this claim, he cannot make this additional showing. It is undisputed that Blair is gainfully employed, no longer begs, and has no intention of resuming begging. He will not be injured should this Court refuse to enjoin further enforcement of § 647(c). Therefore, defendants' motion for summary judgment is granted to the extent it relates to Blair's request

that this Court enjoin further enforcement of § 647(c).

■ Blair cannot make the requisite showing to warrant the issuance of an injunction against further enforcement of § 647(c). Blair, however, is entitled to the declaratory relief he seeks. In his motion, Blair requests an "[o]rder declaring as a matter of law that § 647(c) is unconstitutional on its face...." Notice of Mot. by Pl. for Partial Summ. J. ("Blair Mot."), filed Feb. 22, 1991, at 3.[4] Blair meets the threshold requirements of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, because there exists an actual controversy and federal subject matter jurisdiction. Declaratory relief is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue...." *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir.1986) (citations and quotations omitted). A showing of irreparable injury is not required for the issuance of a declaration. *Steffel v. Thompson*, 415 U.S. 452, 471, 472, 94 S.Ct. 1209, 1221, 1222, 39 L.Ed.2d 505 (1974) (failure to demonstrate irreparable injury does not preclude the granting of declaratory relief); *see also United Food & Commercial Workers Local Union Members v. Food Employers Council, Inc.*, 827 F.2d 519, 526 (9th Cir. 1987) (lack of standing for injunction does not preclude standing for declaratory relief). Because this Court finds § 647(c) to be in violation of the First and Fourteenth Amendments (see discussion in section III.B. below), Blair's motion requesting a declaration that § 647(c) is unconstitutional is granted.

## III. CONSTITUTIONALITY OF § 647(c).

Defendants move for summary judgment on Blair's first and fourth claims for relief, which assert that Blair's arrests violated Article I, Section 2 of the California Consti-

tution and the First Amendment to the United States Constitution.

### A. *California Constitution.*

■ The California Court of Appeal for the First District held § 647(c) to be constitutional under both the United States and California Constitutions. *Ulmer*, 55 Cal. App.3d at 266, 127 Cal.Rptr. at 447. *Ulmer* held that "[b]egging and soliciting for alms do not necessarily involve the communication of information or opinion; therefore, approaching individuals for that purpose is not protected by the First Amendment". *Id.* This Court is bound to follow *Ulmer*'s interpretation of the California Constitution. *Six Cos. of Cal. v. Joint Highway Dist. No. 13 of Cal.*, 311 U.S. 180, 188, 61 S.Ct. 186, 188, 85 L.Ed. 114 (1940) (federal court applying California law bound to follow an announcement of the state law by an intermediate appellate court in California in a ruling that apparently has not been disapproved, provided that there is no convincing evidence that the law of the state is otherwise).

Blair asserts that the California Court of Appeal for the First District has implicitly overruled *Ulmer* and would reach a different result if it were to decide the case today. Blair bases this argument on *Alternatives for California Women, Inc. v. County of Contra Costa*, 145 Cal.App.3d 436, 193 Cal.Rptr. 384 (1st Dist.1983), which struck down as unconstitutional a county ordinance regulating hours for charitable door-to-door solicitation.

Blair argues that no principled distinction can be made between the speech interests protected in *Alternatives* and those advanced by beggars. He concludes that *Alternatives* implicitly holds anti-begging ordinances to be unconstitutional. There is weight to this argument. *Alternatives*, however, which did not address begging and contained no criticism of or even refer-

---

4. In his first amended complaint, Blair unartfully pleads that the statute is unconstitutionally overbroad if interpreted to "allow arrest and prosecution of persons who peacefully solicit funds from members of the public, *without accosting* those persons." First Amended Complaint for Damages, Injunctive and Declaratory Relief (Civil Rights), filed Feb. 9, 1990, at 13.

Such an interpretation would be contrary to the text of the statute itself. The court ignores this confused pleading and instead focuses on the clear request for a "declaration as to the constitutionality of" the code section contained later on that same page of the first amended complaint. *Id.*

ence to *Ulmer*, does not clearly show that a California court would decide *Ulmer* differently today. Thus, in the absence of "convincing evidence that the law of the state is otherwise," *Six Cos.*, 311 U.S. at 188, 61 S.Ct. at 188, this Court must follow the holding of *Ulmer* when interpreting § 647(c) under the California Constitution. Defendants' motion for summary judgment as to plaintiff's fourth claim for relief is granted.

### B. *United States Constitution.*

■ Defendants assert that begging enjoys no protection under the United States Constitution. They contend that, for purposes of constitutional analysis, begging is more conduct than speech because "begging itself conveys no information regarding the reasons [the beggar wants money], the beggar's alleged plight or any broader public concerns." Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. Adjudication ("Defs.' Mem."), filed Feb. 22, 1991, at 5. Defendants rely in large part on *Young v. New York City Transit Authority*, 903 F.2d 146 (2d Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990), which upheld a law proscribing panhandling on New York's subways.

The *Young* court found begging to be a source of too little information to merit protection under the First Amendment:

> The only message that we are able to espy as common to all acts of begging is that beggars want to exact money from those whom they accost. While we acknowledge that passengers generally understand this generic message, we think it falls far outside the scope of protected speech under the First Amendment.

*Id.* at 154. That a request for alms may lead to an exchange of protected speech was irrelevant to the *Young* court: "[T]he object of begging and panhandling is the

transfer of money. Speech simply is not inherent to the act; it is not of the essence of the conduct." *Id.*

Blair argues that this Court should disregard *Young* as factually distinguishable and wrongly decided. Factually, *Young* differs from the case at bar in that *Young* concerned an ordinance prohibiting begging in subways,[5] whereas the case at bar deals with begging on the City's streets and sidewalks. But the *Young* court's observations as to the speech interests implicated by begging were not limited to the fact situation before that court and could apply with equal force to the situation facing this Court.

More convincing is Blair's argument that *Young* fails to recognize that begging implicates the very speech interests present in charitable solicitation cases. The First Amendment clearly protects charitable solicitations. *Schaumburg v. Citizens for A Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Secretary of State of Md. v. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). "[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Id.* at 632, 100 S.Ct. at 833–34. No distinction of constitutional dimension exists between soliciting funds for oneself and for charities.

Begging can promote the very speech values that entitle charitable appeals to constitutional protection.[6] A request for alms clearly conveys information regarding the speaker's plight. Begging gives the speaker an opportunity to spread his views

---

5. Subway passengers, unlike city pedestrians, have no way to escape a beggar's presence. Moreover, the subway, unlike city streets, is not a public forum. Thus, proscribing begging in the subway could be viewed as a reasonable time, place, and manner restriction on the beggar's right to speech.

6. The City argues that under § 647(c) beggars can engage others in conversation about homelessness, poverty, and the structure of our society as long as they do not solicit money. But if beggars could not ask for money, they would probably engage in fewer conversations with passersby. Thus, the prohibition on begging impermissibly chills some protected speech just as limitations on charitable solicitation do.

and ideas on, among other things, the way our society treats its poor and disenfranchised. And in some cases, a beggar's request can change the way the listener sees his or her relationship with and obligations to the poor. "Begging does considerably more than 'propose a commercial transaction.' Like other charitable requests, begging appeals to the listener's sense of compassion or social justice, rather than to his economic self-interest." Hershkoff & Cohen, *Begging to Differ: The First Amendment and the Right to Beg*, 104 Harv.L.Rev. 896, 908 (1991). That many beggars fail to so inform or affect their listeners is irrelevant. Many charitable solicitors fail to educate, enlighten, or persuade their listeners.

The fact that the beggar may keep the money he receives does not strip a beggar's protected speech of its claim to First Amendment protection: "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley,* 487 U.S. at 801 (invalidating a statute that, among other things, compelled professional fund-raisers to disclose to a potential donor the average percentage of their gross receipts that they turned over to the charities for which they solicit).

That the beggar represents himself and not an organized charity should not render his speech unprotected. *Schaumburg* and its progeny focus on the exchange of information inherent in requests for charitable solicitations. Within certain limits, the First Amendment protection depends on the type of speech, and not on the organization promoting the message.[7] "The inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of its source, whether corporation, association, union, or individual." *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978) (First Amendment protects a banking association's right to publicize its views on a referendum proposal).[8]

The *Young* court, however, did find a way to distinguish between solicitations for charitable purposes and solicitations for money for oneself. Under *Young,* begging is distinct from charitable solicitations in that solicitors for charitable causes often convey clearly articulated information to their target about a particular cause or idea whereas beggars do not necessarily convey any such information to the target listener:

> [B]egging is not inseparably intertwined with a "particularized message." It seems fair to say that most individuals who beg are not doing so to convey any social or political message. Rather, they beg to collect money. Arguably, any given beggar may have "[a]n intent to convey a particularized [political or social] message".... However, despite the intent of an individual beggar, there hardly seems to be a "great likelihood" that [those] who witness the conduct are able to discern what the particularized message might be.

903 F.2d at 153–54 (citations omitted). The *Young* holding is not binding on this Court and this Court respectfully declines to follow *Young.*[9]

*Young*'s emphasis on the beggar's motivation seems singularly misplaced in light of the recent Supreme Court cases giving professional fund raisers full First Amendment protection. It would be "fair to say" that most professionals who solicit on behalf of charities "are not doing so to convey any social or political message. Rather

---

7. States can prohibit solicitors for profit-making ventures from fraudulently representing themselves as charitable fund raisers. *Schaumburg,* 444 U.S. at 637, 100 S.Ct. at 836.

8. Thus, an individual with AIDS should be allowed to solicit food for himself just as a group of individuals with AIDS should be able to band together to form a food bank that solicits food for its members.

9. This Court notes, as disturbing, the observation of the *Young* majority that, "[w]hile organized charities serve community interests by enhancing communication and disseminating ideas, the conduct of begging and panhandling in the subway amounts to nothing less than *a menace to the common good.*" 903 F.2d at 156 (emphasis added).

they [do so] to raise money." *Id.* Although many professional fund raisers undoubtedly believe in the causes they promote and genuinely seek to educate others about those causes, many professional fund raisers, like beggars, primarily seek to effect a transfer of money. That the pleas of a beggar or professional fund raiser may change the way his listeners think about their world is often only a desirable side effect. The professional fund raiser may present a clearer message to his listener than the beggar does. But First Amendment protection should not be limited to the articulate. This Court finds that begging constitutes protected speech.

█ Section 647(c) is aimed specifically at protected speech in a public forum; it prohibits begging "in any public place or in any place open to the public." A more encompassing prohibition of speech in a public forum would be difficult to create. To pass constitutional muster, the state must demonstrate that this content-based infringement on free expression in a public forum is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988) (citations and quotations omitted).

As explained by *Ulmer,* the state interest promoted by this statute is to avoid "annoyance" to the public. 55 Cal.App.3d at 265, 127 Cal.Rptr. at 447. Such an interest is hardly compelling. In their briefs, however, defendants assert several other justifications that deserve some discussion. Defendants variously assert that § 647(c) protects the public from "intrusive conduct which is threatening and coercive to those who are accosted" and from "intrusive, coercive behavior."

This Court first notes that preventing an intrusion on the public at large is no more compelling a justification for this limitation on speech than is avoiding annoyance.

Neither of these purported state interests is capable of supporting this statute.

This Court does recognize that avoiding activity variously dubbed "coercive," "threatening," or "intimidating" may be a compelling interest depending on how those words are defined. Assuming that avoiding such activity does represent a compelling state interest in this case, the statute before the Court is neither necessary, nor narrowly drawn, to serve that interest.

The statute at issue is not necessary to achieve those laudable goals. Protecting the public from intimidation, threats, or coercion simply does not require that a form of speech, possessing obvious political relevance and pertinence to the community, which is of crucial importance to those that express the speech, be precluded. Any of the acts of coercing, threatening, or intimidating, if clearly defined, may be constitutionally prohibited by the state via a statute that does not limit the freedom of speech of some citizens. To that end, the Court notes that defendants currently have at their disposal a plethora of content-neutral statutes with which the population at large may be protected from threatening conduct.[10]

The statute is not narrowly drawn to serve the purposes outlined above. Section 647(c), both on its face and as applied by the *Ulmer* court, does not require that an "accost" be either threatening, intimidating, or coercive to violate § 647(c). This Court holds that *Ulmer* requires an accost to mean "[w]alking up to and approaching" a passerby. 55 Cal.App.3d at 267, 127 Cal. Rptr. at 448. So interpreted, the statute remains unconstitutional; walking up to someone is not a concrete enough proxy for a threat to warrant this restriction on speech. The City, in contrast, interprets *Ulmer* to hold that "any approach" constitutes an "accost." Likewise, "any approach" is certainly not a close enough proxy for a threat or intimidation to warrant this restriction on speech. A narrow-

10. The Court notes, among others, Cal.Penal Code §§ 211 (robbery), 240 (assault), 242 (battery), 415(1) (challenging to a fight), 415(2) (disturbing another by loud noise), 415(3) (use of offensive words), and 647c (willful and malicious obstruction of thoroughfares and public places).

ly-drawn statute would define the proscribed acts with relation to the threats or intimidation to be avoided and not with relation to protected speech. It is speech that the state bars with this statute, not threatening or intimidating encounters in public space.

City streets are a public forum, one of the few remaining democratic spaces where the conventioneer, the gawking tourist, the eager consumer, the city resident, and the needy may mingle freely. Under this statute, City authorities claim the power to remove from this public forum those that through the exercise of their First Amendment rights, plus additional unspecified conduct, make the rest of us uncomfortable. The speech of the needy around us may well be subjectively felt as an unwelcome intrusion by some, but the expressive freedom guaranteed by the Constitution has never been costless. That speech may not be barred by a statute such as this.

█ In addition, this statute violates the Fourteenth Amendment right to equal protection in that it "discriminates between lawful and unlawful conduct based upon the content of ... communication." [11] *Carey v. Brown*, 447 U.S. 455, 460, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). In *Carey*, a statute banning all picketing on nonlabor issues was held to violate the Fourteenth Amendment. Here, only begging (accompanied with an approach and the initiation of conversation) is proscribed. One may approach and speak at will to solicit directions or the time of day, request signatures for a petition, or any number of other common occurrences without running afoul of this statute.

In defense of § 647(c), defendants cite *United States v. Kokinda*, —— U.S. ——, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). The plurality in *Kokinda* stated: "It is the inherent nature of solicitation itself, a *content-neutral ground*, that the Service justifiably relies upon when it concludes that

solicitation is disruptive of its business." *Id.* —— U.S. at ——, 110 S.Ct. at 3124 (emphasis added). This quotation, however, proves far too much. Section 647(c) is not content neutral. If the defendants had cited this quotation in support of a statute that banned any "approach" where the alleged miscreant spoke to the victim first, its position would be strong. All "accosts," however defined, may be disruptive, but this statute does not bar all accosts. The defendants also argue that this statute is not based on the views or the content of expression of a particular beggar, and that the law treats all beggars equally. These arguments skirt the issue. The issue is not whether all beggars are treated alike, but whether all who (using the City's reading of *Ulmer*) approach others and speak to them first are treated alike. Manifestly, they are not.

This Court recognizes that there is the possibility that a request for a dollar, which when transcribed onto paper appears to be quite harmless, may actually have been, depending on the circumstances of the moment, intended to be, or perceived as, a *demand* for the dollar. This Court also recognizes that when a stranger asks one what time it is, the possibility is infinitely smaller that such a request is really a demand for the watch. It is entirely appropriate that the legislature may take such differences into account in drafting a statute intended to reduce the perceived evil of street intimidation for money. The people of San Francisco deserve, and are entitled to expect, police protection from any such intimidation, coercion, or threat for alms. However, "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests...." *Carey*, 447 U.S. at 461, 100 S.Ct. at 2290–91. As shown above, this statute is not finely tailored. Solicitations for alms are not generally and frequently enough proxies for intimidating

---

11. Defendants make no motion concerning the Fourteenth Amendment. Blair's motion for summary judgment as to the ultimate liability of all defendants excepting Frank Jordan, however, is based, in part, on the claim that § 647(c) violates the Equal Protection Clause of the Fourteenth Amendment.

or coercive threats to justify this statute. This case falls squarely under the holding in *Carey;* the statute violates the Equal Protection Clause of the Fourteenth Amendment.

The City's motion for summary judgment on Blair's first claim for relief is denied. Plaintiff's opposing motion for a declaration that § 647(c) is unconstitutional on its face is therefore granted.

## IV. LIABILITY UNDER 42 U.S.C. § 1983.

■ Both sides move for summary judgment on defendants' liability under 42 U.S.C. § 1983 for violating Blair's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. For municipal liability to attach, Blair must demonstrate that execution of a City policy caused his constitutional deprivations. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Alternatively, in the absence of an explicit City policy, Blair must demonstrate the existence of a failure to train officers properly that amounts to a *de facto* policy of deliberate indifference to the rights of those people with whom the police come in contact. *Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). The parties argue both aspects of this issue. Although the Court finds that Blair has established a triable issue of fact under the *Monell* holding (and thus discussion of the *Canton* approach is not necessary), in the interests of thoroughness, both approaches will be analyzed.

For liability to attach to the Arresting Officers, Blair must demonstrate that the "contours of the right [that the Arresting Officers violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Applying these rules, the Court now returns to the motions.

A. *First and Fourteenth Amendments.*

■ For Blair to win on his motion for summary judgment as to the liability of the City under § 1983, he must show that "execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. Thus, Blair must demonstrate both an official policy and a "direct causal link between [that policy] or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385, 109 S.Ct. at 1202–03 (explaining *Monell*).

Blair cannot meet this requirement on these pleadings, and so his motion must be denied. Blair has demonstrated the existence of the required official policy in § 120 [12] of the San Francisco Police Code. He has also presented some evidence that supports the contention that this policy was the moving force behind his unconstitutional arrests. *See*, Pl.'s Reply Mem. of P. & A. in Supp. of Pl.'s Mot. for Partial Summary J., filed Mar. 21, 1991, at 20. Blair, however, has not demonstrated a factually undisputed causal connection between this policy and the violations of his constitutional rights. The City has presented evidence adequate to withstand summary judgment on this issue. *See* Defs.' Opp'n to Mot. for Partial Summ. J., filed Mar. 14, 1991, at 16, 17.

■ Under *Canton*, Blair may demonstrate the existence of a "policy" where there exists a "failure to train [that] amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388, 109 S.Ct. at 1204. Defendants move for summary judgment on this issue, claiming that Blair cannot make any such showing as a matter of law. There is no dispute that the City has sufficiently frequent contact with beggars to warrant the development of a training program that focuses on constitutional treatment of them. The City has such a program, but Blair states that it is so inadequate that it constitutes deliberate

---

**12.** This code section provides: "It shall be unlawful for any person to beg or practice begging in or on any public street or in any public place."

indifference on the City's part to the rights of beggars. As regards Blair's efforts to establish the City's § 1983 liability for his First and Fourteenth Amendment violations under the *Canton* approach, defendants' motion for summary judgment must be granted.

Blair argues that the City should have told its officers that § 647(c) is unconstitutional and should not be enforced. He claims that the only acceptable training program regarding this statute would be one that forbade officers from enforcing it. This Court finds that the statute is unconstitutional on its face. The training program the City conducted, however, was based on the holding of the highest California court to rule on the statute. That court found the statute to be constitutional. Solely for the purposes of establishing its training program, the City was entitled to rely on that court's determination as to the statute's constitutionality. No reasonable jury could find that reliance by the City on the *Ulmer* decision as to the statute's constitutionality constitutes "deliberate indifference" to the rights of beggars. On the issue of the existence of a *de facto* policy under *Canton* that may have caused the violations of Blair's First and Fourteenth Amendment rights, defendants' motion for summary judgment is granted.

 Both parties move for summary judgment on the issue of the Arresting Officers' limited immunity for violations of Blair's First and Fourteenth Amendment rights. Blair argues that no reasonable police officer could have believed that Blair's arrests were lawful in light of the clearly established law at the time, and the facts upon which the arrests were based. According to Blair, the Arresting Officers should have read *Schaumburg*, *Alternatives*, and *Carey*, disregarded *Ulmer*, and should have known that § 647(c) violates the Constitutions of the United States and California. The Court cannot place such a burden on these officers. Accordingly, the Arresting Officers are entitled to qualified immunity against any § 1983 claims based on violations of Blair's First and Four-

teenth Amendment rights committed while enforcing § 647(c).

### B. *Fourth Amendment Violations.*

 Blair also claims that the SFPD repeatedly violated his Fourth Amendment rights. He claims he was arrested without probable cause. This claim stands independent of Blair's argument as to the constitutionality of § 647(c). " '[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. De Fillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). Probable cause to arrest under § 647(c) requires both an "accost" and a solicitation for alms. Both sides admit that on four occasions, police officers arrested Blair for violating § 647(c) even though he was stationary while begging. Therefore, this claim hinges on the proper interpretation of an "accost" under *Ulmer*'s hitherto definitive reading of § 647(c).

The City argues that the training it provides its officers in the application of § 647(c) insulates it from liability under § 1983. The City avers that it informs all its officers that accosting the passerby (defined by the City to mean to "approach" and initiate conversation) is an essential element of § 647(c). Lawson Decl., filed Feb. 22, 1991, at ¶¶ 5, 6, Ex. A.

Blair quotes from *Ulmer* to support his assertion that "walking up to" another person is an essential element of probable cause to arrest under § 647(c). *Ulmer* stated that:

> [T]he meaning connoted by the word "accost" is clear from the legislative materials noted above: the statute is "aimed at the conduct of the individual who *goes about on the streets* accosting others for handouts" (emphasis added); the statute does not extend to one "who merely sits or stands by the wayside." Walking up to and approaching another for the purpose of soliciting, as opposed to merely receiving donations, is prohibited by the statute.... The statute forbids any ap-

proach in a public place for the purpose of soliciting or begging for alms.

55 Cal.App.3d at 266–67, 127 Cal.Rptr. at 447–48 (citations omitted). This Court notes as especially relevant the fact that "[w]alking up to and approaching" is conjugated as a single activity that *"is* prohibited." Id, 55 Cal.App.3d at 267, 127 Cal. Rptr. at 448 (emphasis added.) Thus, the later reference in that paragraph to "any approach" is properly understood as a short-hand reference to "walking up to and approaching."

Blair argues that the City's training is deficient in that it fails to explain "that walking toward another is an essential element of a § 647(c) violation," and instead states that " '[t]he asking, soliciting, or begging constitutes the crime.' " Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. for Summ. Adjudication, at 20 (quoting the Basic Course Unit Guide published by The Commission on Peace Officer Standards and Training, cited in Lawson Decl., Ex. A). Although accurate, Blair's argument fails for purposes of summary judgment.

*Canton* held that:

[It] may happen that in light of the duties assigned to specific officers or employees *the need for more or different training* is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at 390, 109 S.Ct. at 1705 (emphasis added). Blair's argument basically boils down to the assertion that because the City chose the wrong interpretation of *Ulmer* for its training program, the need for different training was so obvious that *Canton's* requirements for liability were met as a matter of law. This Court agrees that the training guidelines, if they allow an officer to arrest for an "approach" that is simply the raising of one's hand, misconstrue *Ulmer.*[13] The interpretation the guidelines utilize, however, is colorable. A fair reading of the SFPD training manual and Lawson's declaration shows the SFPD teaches its officers that approaching another is an essential element of a § 647(c) violation. In this way, the training materials follow the holding in *Ulmer.*[14] A reasonable jury could decide that the interpretation used by the guidelines is not so egregious a misconstruction as to constitute deliberate indifference to Blair's Fourth Amendment rights. Summary judgment is, therefore, inappropriate.

■ Blair was arrested without the probable cause required by *Ulmer* on at least four occasions.[15] The Arresting Officers were surely entitled to rely on the First Amendment interpretation of § 647(c) given by *Ulmer.* The law as to probable cause, however, was not ambiguous or in flux. Under *Ulmer,* an accost could only be accomplished by "walking up to and approaching" a passerby. 55 Cal.App.3d at 267, 127 Cal.Rptr. at 448. It is undisputed that during these four arrests Blair was stationary. Defs.' Statement of Genuine Issues in Opp'n to Pl.'s Mot. for Partial Summ. J., filed Mar. 14, 1991, at 3, 4, 5, 9,

---

**13.** It is not entirely clear that the guidelines misconstrue the *Ulmer* reading of the statute. The guidelines use the word "approach" as does the *Ulmer* opinion. The *Ulmer* opinion intended "approach" to be synonymous with walking up to someone. The guidelines do not on their face disagree. As applied by the Arresting Officers, however, the guidelines do misconstrue *Ulmer.* It may well be that Blair's Fourth Amendment rights were violated because the Arresting Officers *misapplied their training* and not because the City improperly trained. The allocation of any liability between these parties is also a jury question.

**14.** The guide reads in relevant part:

*Subsection (c): Begging (Misdemeanor)*

"Who accosts other persons in any public place (or) in any place open to the public for the purpose of *begging or soliciting alms."*
(1) Accost:
 (a) To approach and speak to first
(2) Begging as a business does not have to be established.
(3) The asking, soliciting, or begging constitutes the crime.
(4) The victim does not have to give to complete the act.
Lawson Decl., Ex. A at 11–5, 11–6.

**15.** As to the fifth arrest, it is disputed whether or not Blair was walking towards passersby while soliciting on that occasion. This discussion does not apply to Arresting Officers Paulson and Breen.

10. Thus, as a matter of law, he could not have committed an accost as defined by *Ulmer* on those occasions. Therefore, those arrests were made without probable cause.[16]

A question of fact exists, however, as to whether the involved officers, Shanahan, Lassus, and Levin, are entitled to qualified immunity for these actions. If they were properly implementing the training they received from the City, then these officers face no liability; but the City may. If, however, the City training program was properly understood to require an "approach" to mean walking towards the passerby, then it is possible that these officers improperly implemented their training. Again, it is for the jury to determine the respective liability, if any, of the City and these officers. As to the fifth arrest, a factual dispute exists as to whether Blair was or was not walking towards people while soliciting alms. Whether there was a Fourth Amendment violation in that instance and whether the City or the individual officers involved face any liability are also jury questions.

Accordingly,

IT IS HEREBY ORDERED that:

1. Blair has standing to sue for equitable relief in this Court.

2. Blair's motion for a declaration to the effect that § 647(c) is unconstitutional on its face is granted.

3. Defendants' motion for summary judgment as to Blair's request for a permanent injunction enjoining further enforcement of § 647(c) is granted.

4. Defendants' motion for summary judgment on Blair's fourth claim for relief, for violations of Article 1, Section 2 of the California Constitution is granted.

5. Defendants' motion for summary judgment as to the qualified immunity of the Arresting Officers for any violations of Blair's First Amendment rights is granted.

6. Defendants' motion for summary judgment on Blair's first claim for relief, for violations of the First Amendment to the United States Constitution is, denied.

7. Both parties' motions for summary judgment on the City's liability under 42 U.S.C. § 1983 for the violations of Blair's First, Fourth and Fourteenth Amendment rights are denied.

8. Blair's motion for partial summary judgment concerning the Arresting Officers' liability under § 1983 for violations of Blair's Fourth Amendment rights is denied.[17]

---

16. The constant refrain in the defendants' opposition memorandum as to the "crowded sidewalks" is, of course, wholly irrelevant to the issue of whether or not an "accost" took place as defined by *Ulmer*.

17. Disposing of these motions greatly reduces the issues before this Court. The remaining issues for trial are as follows:

1. The liability, if any, of the City under § 1983 for the First and Fourteenth Amendment violations.

2. The liability, if any, and the allocation of that liability between the City and the Arresting Officers under § 1983 for the Fourth Amendment violations.

3. The liability, if any, of Frank Jordan for any of these constitutional violations.

4. The amount of damages that may be appropriate for any and all of these constitutional violations.

5. Blair's request for an injunction forcing the City to destroy any record of his arrests under § 647.

6. Whether any further declaration should issue pursuant to Blair's third prayer for relief.