Jennifer LOPER, William Kaye, on behalf of themselves, and all others similarly situated, Plaintiffs–Appellees,

v.

The NEW YORK CITY POLICE DEPARTMENT, Lee P. Brown, Commissioner of NYC Police Dept., Defendants–Appellants.

No. 1035, Docket 92–9127.

United States Court of Appeals,
Second Circuit.

Argued May 12, 1993.

Decided July 29, 1993.

Fay Leoussis, Asst. Corp. Counsel City of New York, New York City (O. Peter Sherwood, Corp. Counsel, Leonard Koerner, Bruce Rosenbaum, of counsel), for defendants-appellants.

George Sommers, New York City, for plaintiffs-appellees.

Robert Teir and Henry J. Stern, New York City Submitted a Brief for amici curiae American Alliance for Rights and Responsibilities and The Citizens Union of the City of New York in Support of defendants-appellants.

Before: MINER, McLAUGHLIN and FRIEDMAN,* Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants The New York City Police Department and Lee F. Brown, Commissioner of the Department, ("City Police") appeal from a summary judgment entered in the United States District Court for the Southern District of New York (Sweet, *J.*) in favor of plaintiffs-appellees Jennifer Loper and William Kaye, on behalf of themselves and all others similarly situated ("Plaintiffs"). The district court in this case has certified a plaintiff class consisting of all "needy persons who live in the State of New York, who beg on the public streets or in the public parks of New York City." *Loper v. New York City Police Dep't*, 802 F.Supp. 1029, 1033 (S.D.N.Y.1992). The court defined a "needy person" as "someone who, because of poverty, is unable to pay for the necessities of life, such as food, shelter, clothing, medical care, and transportation." *Id.* The judgment declared unconstitutional on First Amendment grounds the following provision of the New York Penal Law and enjoined the City Police from enforcing it:

> A person is guilty of loitering when he:
> 1. Loiters, remains or wanders about in a public place for the purpose of begging. . . .

N.Y. Penal Law § 240.35(1) (McKinney 1989).

On appeal, the City Police argue that begging has no expressive element protected by the First Amendment, that even if a speech interest is implicated in Plaintiffs' conduct, the government's interest in the maintenance of order outweighs the Plaintiffs' interest, and that, in any event, the message Plaintiffs seek to convey is entitled only to the "minimal protection" afforded by the "outer perimeters of the First Amendment."

The City Police regard the challenged statute as an essential tool to address the evils associated with begging on the streets of New York City. They assert that beggars tend to congregate in certain areas and become more aggressive as they do so. Residents are intimidated and local businesses suffer accordingly. Panhandlers are said to station themselves in front of banks, bus stops, automated teller machines and parking lots and frequently engage in conduct described as "intimidating" and "coercive." Panhandlers have been known to block the sidewalk, follow people down the street and threaten those who do not give them money. It is said that they often make false and fraudulent representations to induce passers-by to part with their money. The City Police have begun to focus more attention on order maintenance activities in a program known as "community policing." They contend that it is vital to the program to have the statute available for the officers on the "beat" to deal with those who threaten and harass the citizenry through begging.

Although it is conceded that very few arrests are made and very few summonses are issued for begging alone, officers do make frequent use of the statute as authority to order beggars to "move on." The City Police advance the theory that panhandlers, unless stopped, tend to increase their aggressiveness and ultimately commit more serious crimes. According to this theory, what starts out as peaceful begging inevitably leads to the ruination of a neighborhood. It appears from the contentions of the City Police that only the challenged statute stands between safe streets and rampant crime in the city.

It is ludicrous, of course, to say that a statute that prohibits only loitering for the purpose of begging provides the only authority that is available to prevent and punish all the socially undesirable conduct incident to begging described by the City Police. There are, in fact, a number of New York statutes that proscribe conduct of the type that may accompany individual solicitations for money in the city streets. For example, the crime of harassment in the first degree is committed by one who follows another person in or about a public place or places or repeatedly

---

* The Honorable Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

commits acts that place the other person in reasonable fear of physical injury. N.Y. Penal Law § 240.25 (McKinney Supp.1993). If a panhandler, with intent to cause public inconvenience, annoyance or alarm, uses obscene or abusive language or obstructs pedestrian or vehicular traffic, he or she is guilty of disorderly conduct. N.Y. Penal Law §§ 240.20(3), (5) (McKinney 1989). A beggar who accosts a person in a public place with intent to defraud that person of money is guilty of fraudulent accosting. *Id.* § 165.-30(1). The crime of menacing in the third degree is committed by a panhandler who, by physical menace, intentionally places or attempts to place another person · in fear of physical injury. · N.Y. Penal Law § 120.15 (McKinney Supp.1993).

The distinction between the statutes referred to in the preceding paragraph and the challenged statute is that the former prohibit conduct and the latter prohibits speech as well as conduct of a communicative nature. Whether the challenged statute is consonant with the First Amendment is the subject of our inquiry. We do not write upon a clean slate as regards this inquiry, since the Supreme Court as well as this Court has addressed restrictions on the solicitation of money in public places.

In *Young v. New York City Transit Authority,* 903 F.2d 146 (2d Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990), there was at issue before us a regulation prohibiting begging and panhandling in the New York City Subway System. In that case we "wonder[ed]" whether the beggars' "conduct is not divested of any expressive element as a result of the special surrounding circumstances involved in" begging in the subway, but we did not rest our decision "on an ontological distinction between speech and conduct." *Id.* at 154. We did find that the conduct element of begging, in the confined atmosphere of the subway, " 'disrupts' and 'startles' passengers, thus creating the potential for a serious accident in the fast-moving and crowded subway environment." *Id.* at 158. This finding led to our conclusion that the New York City Transit Authority's "judgment that begging is alarmingly harmful conduct that simply cannot be accommo-

dated in the subway system is not unreasonable." *Id.*

In our First Amendment analysis in *Young,* we applied the "more lenient level of judicial scrutiny," *id.* at 157, prescribed in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (conviction for destruction of draft card in anti-war protest allowed to stand where speech and non-speech elements combined in same course of conduct). In accordance with the test outlined in *O'Brien,* we determined: 1) that the subway regulation was within the constitutional power of ·government; 2) that the regulation advanced substantial and important governmental interests; 3) that the governmental interests were not related to the suppression of free expression; and 4) that, because "the exigencies created by begging and panhandling in the subway warrant the conduct's complete prohibition," *Young,* 903 F.2d at 159, the First Amendment freedom restrictions were no greater than were essential to further the government's interest. *Id.* at 157–59. Citing *Ward v. Rock Against Racism,* 491 U.S. 781, 802, 109 S.Ct. 2746, 2759–60, 105 L.Ed.2d 661 (1989), we observed that ample alternative channels of communication were open. Most pertinent to our analysis in the case at bar, we stated:

> Under the regulation, begging is prohibited only in the subway, not throughout all of New York City. It is untenable to suggest, as do the plaintiffs, that absent the opportunity to beg and panhandle in the subway system, they are left with no means to communicate to the public about needy persons.

*Young,* 903 F.2d at 160. The case before us does prohibit begging throughout the City and does leave individual beggars without the means to communicate their individual wants and needs.

We also decided in *Young* that the district court erred in concluding that the subway is a public forum where begging and panhandling must be allowed. We indicated that the subway is at best a limited forum that could be, and was, properly restricted as to the types of speech and speakers permitted:

> [T]here can be no doubt that the [New York City Transit Authority] intended to

continue its long-standing prohibition of begging and panhandling even after revising the regulation to permit solicitation by organizations.

*Id.* at 161. The special conditions of the subway system were said to require a limitation on expressive activity, and we referred in *Young* to our earlier holding in *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767, 772–73 (2d Cir.1984), that the subway is not an open forum for public communication either by tradition or designation. Despite government ownership, it is the nature of the forum that we must examine in order to determine the extent to which expressive activity may be regulated. It long has been settled that all forms of speech need not be permitted on property owned and controlled by a governmental entity. *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981).

In *International Society for Krishna Consciousness, Inc. v. Lee*, —— U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), *aff'g in part*, 925 F.2d 576 (2d Cir.1991), the Supreme Court agreed with us that a regulation prohibiting solicitation of funds in airline terminals operated by a public authority did not violate the First Amendment. The plaintiff in that case was a religious sect whose members solicited funds in public places as part of a ritual. The Court "conclude[d] that the terminals are nonpublic fora and that the regulation reasonably limits solicitation." *Id.* —— U.S. at ——, 112 S.Ct. at 2706. This conclusion followed the now-familiar " 'forum-based' approach for assessing restrictions that the government seeks to place on the use of its property." *Id.* —— U.S. at ——, 112 S.Ct. at 2705. It also followed this significant observation by the Court: "It is uncontested that the solicitation at issue in this case is a form of speech protected under the First Amendment." *Id.*

■ The forum-based approach for First Amendment analysis subjects to the highest scrutiny the regulation of speech on government property traditionally available for public expression. *Id.* Such property includes streets and parks, which are said to "have

immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (citation omitted).

■ The category of public property opened for expressive activity by part or all of the public is known as the designated public forum, which may be of a limited or unlimited character. *Id.* The same limitations as those governing the traditional public forum apply to the regulation of such property. *Id.* at 46, 103 S.Ct. at 955–56. The regulation of expressive activity on public property neither traditionally available nor designated for that purpose is subject only to a limited review—the regulation must be reasonable and not designed to prohibit the activity merely because of disagreement with the views expressed. *Id.* The airport terminals in *International Society* were classified as nonpublic fora, and the regulation prohibiting solicitations there was subject only to a reasonableness review, which it passed. *International Soc'y*, —— U.S. at ——————, 112 S.Ct. at 2706–08. According to a plurality of the Court, the same was true for a postal service regulation prohibiting solicitation on a sidewalk located on postal service property leading from a parking lot to a post office. *See United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). In *Kokinda*, the Court noted that postal service property was dedicated to

one means of communication only: public notices were allowed to be posted on bulletin boards designated for the purpose. *Id.* at 730, 110 S.Ct. at 3121–22.

■ The sidewalks of the City of New York fall into the category of public property traditionally held open to the public for expressive activity. *See United States v. Grace,* 461 U.S. 171, 179–80, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) (sidewalks comprising the outer boundaries of the Supreme Court grounds are indistinguishable from other sidewalks in Washington, D.C. and constitute a proper public forum). Conduct of a communicative nature cannot be regulated in "these quintessential public forums" in the same manner as it can be regulated on the streets of a military reservation. *See Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

■ It cannot be gainsaid that begging implicates expressive conduct or communicative activity. *See* Anthony J. Rose, Note, *The Beggar's Free Speech Claim,* 65 Ind.L.J. 191, 200–02 (1989). As agreed by the parties in *International Society,* begging is at least "a form of speech." —— U.S. at ——, 112 S.Ct. at 2705. In *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), the Supreme Court struck down an ordinance prohibiting solicitation by charitable organizations that did not use at least seventy-five percent of their revenues for charitable purposes. The Court held that

> charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes— that are within the protection of the First Amendment.... [S]olicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on ... social issues, and ... without solicitation the flow of such information and advocacy would likely cease.

*Id.* at 632, 100 S.Ct. at 834; *accord Riley v. National Fed. of the Blind of N.C., Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (striking down North Carolina statute

regulating the fees that professional fund-raiser may charge a charity); *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (striking down Maryland statute that prohibited charitable organization, in connection with fund raising activity, from paying professional fund raiser's expenses if those expenses exceeded twenty-five percent of the amount raised).

Inherent in all the charitable solicitation cases revolving around the First Amendment is the concept that "[c]anvassers in such contexts are necessarily more than solicitors for money." *Village of Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 834. While we indicated in *Young* that begging does not always involve the transmission of a particularized social or political message, *see Young,* 903 F.2d at 153, it seems certain that it usually involves some communication of that nature. Begging frequently is accompanied by speech indicating the need for food, shelter, clothing, medical care or transportation. Even without particularized speech, however, the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance. We see little difference between those who solicit for organized charities and those who solicit for themselves in regard to the message conveyed. The former are communicating the needs of others while the latter are communicating their personal needs. Both solicit the charity of others. The distinction is not a significant one for First Amendment purposes. *See Blair v. Shanahan,* 775 F.Supp. 1315, 1322 (N.D.Cal. 1991) (appeal pending).

Having established that begging constitutes communicative activity of some sort and that, as far as this case is concerned, it is conducted in a traditional public forum, we next examine whether the statute at issue: (1) is necessary to serve a compelling state interest and is narrowly tailored to achieve that end; or (2) can be characterized as a regulation of the time, place and manner of expression that is content neutral, is narrowly tailored to serve significant government interests and leaves open alternate channels

of communication. *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 954–55.

First, it does not seem to us that any compelling state interest is served by excluding those who beg in a peaceful manner from communicating with their fellow citizens. Even if the state were considered to have a compelling interest in preventing the evils sometimes associated with begging, a statute that totally prohibits begging in all public places cannot be considered "narrowly tailored" to achieve that end. Because of the total prohibition, it is questionable whether the statute even can be said to "regulate" the time, place and manner of expression but even if it does, it is not content neutral because it prohibits all speech related to begging; it certainly is not narrowly tailored to serve any significant governmental interest, as previously noted, because of the total prohibition it commands; it does not leave open alternative channels of communication by which beggars can convey their messages of indigency. In regard to the "alternative channels" issue in *Young,* we observed that the prohibition on panhandling in the subway did not foreclose begging "throughout all of New York City." *Young,* 903 F.2d at 160. Where, as here, a regulation is neither content neutral nor narrowly tailored, it cannot be justified as a proper time, place or manner restriction on protected speech, *regardless* of whether or not alternate channels are available. *See City of Cincinnati v. Discovery Network, Inc.,* — U.S. —, —, 113 S.Ct. 1505, 1517, 123 L.Ed.2d 99 (1993) (ban on distribution of commercial handbills on news racks held violative of First Amendment).

Even if we were to apply the *O'Brien* analysis, as we did in *Young,* we would find that the New York statute does not pass First Amendment muster. According to *O'Brien,* it is permissible to establish "incidental limitations on First Amendment freedoms" in order to protect a "sufficiently important governmental interest" that is "unrelated to the suppression of free expression." *O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1679. Here, the total prohibition on begging in the city streets imposed by the statute cannot be characterized as a merely incidental limita-

tion, because it serves to silence both speech and expressive conduct on the basis of the message. *See* Helen Hershkoff & Adam S. Cohen, *Begging to Differ: The First Amendment and the Right to Beg,* 104 Harv.L.Rev. 896, 909 (1991). Carrying out the *O'Brien* analysis, the statute in no way advances substantial and important governmental interests. If it did, the State would not allow, as it does, the solicitation of contributions on city streets by individuals who represent charitable organizations that have registered with the Secretary of the State of New York. *See* N.Y.Exec.Law § 172 (McKinney 1993). Moreover, certain religious, educational and fraternal organizations are entitled to solicit contributions in New York through individual solicitors even without registration, due to a statutory exemption. *See id.* § 172–a. If individuals may solicit for charitable and other organizations, no significant governmental interest is served by prohibiting others for soliciting for themselves. Certainly, a member of a charitable, religious or other organization who seeks alms for the organization and is also, as a member, a beneficiary of those alms should be treated no differently from one who begs for his or her own account. *See* Charles Feeney Knapp, Note, *Statutory Restriction of Panhandling in Light of* Young v. New York City Transit: *Are States Begging Out of First Amendment Proscriptions?,* 76 Iowa L.Rev. 405, 416 (1991).

Assuming that the statute at issue were to be classified as an incidental restriction on free expression, *O'Brien* requires that the restriction be "no greater than is essential to the furtherance" of the government's interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. According to the City Police, the interest of the government lies in preventing the fraud, intimidation, coercion, harassment and assaultive conduct that is said frequently to accompany begging by individual street solicitors who do not solicit on behalf of any organization. But, as has been demonstrated, there are a number of statutes that address this sort of conduct specifically. The statute that prohibits loitering for the purpose of begging must be considered as providing a restriction greater than is essential

to further the government interests listed by the City Police, for it sweeps within its overbroad purview the expressive conduct and speech that the government should have no interest in stifling. *See C.C.B. v. Florida,* 458 So.2d 47 (Fla.Dist.Ct.App.1984). A verbal request for money for sustenance or a gesture conveying that request carries no harms of the type enumerated by the City Police, if done in a peaceful manner. However, both the organizational solicitor *and* the individual solicitor are prosecutable for conduct that oversteps the bounds of peaceful begging.

In *City of Seattle v. Webster,* 115 Wash.2d 635, 802 P.2d 1333 (1990) (en banc), *cert. denied,* — U.S. —, 111 S.Ct. 1690, 114 L.Ed.2d 85 (1991), the Supreme Court of the State of Washington rejected a constitutional challenge to a Seattle ordinance that prohibited people from obstructing pedestrian or vehicular traffic or aggressively begging. *See* Seattle, Wash.Mun.Code § 12A.12.015(B) (1987). "Aggressively beg" was defined in the ordinance as meaning "to beg with [the] intent to intimidate another person into giving money or goods." *Id.* § 12A.12.-015(A)(1). "Obstruct pedestrian or vehicular traffic" meant "to walk, stand, sit, lie, or place an object in such a manner as to block passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact." *Id.* § 12A.12.015(A)(3). Constitutionally protected picketing and protesting explicitly were exempted from punishment. *Id.* In upholding the statute, the *Webster* court emphasized that the specific intent element of the statute saved it from being overbroad, vague or unreasonable. *Webster,* 802 P.2d at 1338–40. Although the majority of the court in that case focused its analysis on the "pedestrian interference" language of the statute because the defendant in the case had not been charged with aggressive begging, Justice Utter found that begging was protected speech that could be regulated with narrowly drawn time, place and manner restrictions. *Id.* at 1342–44 (Utter, J., concurring in part and dissenting in part).

We refer to *Webster* only because it deals with a regulation that prohibits conduct that extends beyond speech, expression and communication. In contrast with the Seattle ordinance, the statute before us prohibits verbal speech as well as communicative conduct, not in the confined precincts of the subway system, *see Young, supra,* or in the crowded environment of a state fair, *see Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 651, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981), but in the open forum of the streets of the City of New York. The New York statute does not square with the requirements of the First Amendment. The plaintiffs have demonstrated that they are entitled to the relief they seek. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984).

The judgment appealed from is affirmed.